GARY ANTONIDES, ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 10364-86, 17542-86, 17543-86.　　　　Filed September 27, 1988.

---

[1]The cases of the following petitioners are consolidated herewith: Richard and Phyllis Herdendorf, docket No. 17542-86; and David A. and Mary Diane Smith, docket No. 17543-86.

*Thomas J. O'Rourke* and *John J. Mullenholz,* for the petitioners.

*Alan C. Levine,* for the respondent.

WELLS, *Judge:** In timely statutory notices of deficiency, respondent determined deficiencies in Federal income tax and additions to tax for taxable year 1982 as follows:

| Petitioners | Docket No. | Defic- iency | Additions to tax | | |
|---|---|---|---|---|---|
| | | | Sec. 6653(a)(1)[2] | Sec. 6653(a)(2) | Sec. 6661 |
| Gary Antonides | 10364-86 | $9,700 | $485 | 50 percent of interest on $9,700 | $970 |
| Richard and Phyllis Herdendorf | 17542-86 | 4,430 | - - - | - - - | - - - |
| David and Mary Diane Smith | 17543-86 | 8,119 | - - - | - - - | 812 |

Respondent concedes that the investment tax credits claimed by petitioners in 1981 are not subject to recapture in 1982. Petitioner Antonides concedes that he understated taxable income for the year at issue by the $5,439 he received from an entity called Maratech.

The remaining issues for decision are:

(1) Whether petitioners' yacht chartering activities constituted an "activity not engaged in for profit" within the meaning of section 183(a);

---

*By order of the Chief Judge, this case was assigned to Judge Thomas B. Wells for decision and opinion. The findings of fact were made by Judge Jules G. Korner III, who conducted the trial.

[2]All statutory references are to sections of the Internal Revenue Code in effect in the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

(2) Alternatively, whether section 280A limits the deductibility of deductions claimed by petitioners with respect to their yacht chartering activity;

(3) Whether petitioners properly allocated income and expenses generated in their yacht chartering activity in accordance with their partnership agreement;

(4) Whether petitioner Antonides is liable for the additions to tax for negligence as provided by sections 6653(a)(1) and 6653(a)(2); and

(5) Whether petitioners Antonides and the Smiths are liable for additions to tax for substantial understatement of liability as provided by section 6661.

In his trial memorandum and opening statement, respondent for the first time argued that petitioners' use of the $18,958 of advance lease payments to which they were entitled as downpayment on their yacht purchase was a sham which should be given no effect for tax purposes. We hold that petitioners did not receive fair notice of this issue and we will not consider it. *Seligman v. Commissioner*, 84 T.C. 191, 197-199 (1985), affd. 796 F.2d 116 (5th Cir. 1986); *Estate of Horvath v. Commissioner*, 59 T.C. 551, 554-557 (1973).

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference.

Gary Antonides (Antonides) resided at Edgewater, Maryland, at the time his petition herein was filed. Richard and Phyllis Herdendorf are husband and wife. They resided at Buffalo, New York, at the time their petition herein was filed. David and Mary Diane Smith (the Smiths) are husband and wife. They resided at Clifton, Virginia, at the time their petition herein was filed.

All of the petitioners are cash basis, calendar year taxpayers. David Smith (Smith) and Phyllis Herdendorf are brother and sister.

Antonides and Smith have known each other since their days as classmates at the U.S. Naval Academy during the mid-1950s. While at the Naval Academy, each received instruction in sailing and developed an interest in sailing

and sailboats. This interest continued after graduation from the Academy. Antonides has owned sailboats for his personal use since the 1970s. Although he never owned a boat before the one now in issue, Smith had access to boats which he used for pleasure sailing. The Herdendorfs are also avid sailors who over the years have owned a number of boats which they have sailed for pleasure on Lake Erie near their home in Buffalo, New York.

At some time in 1979, Smith became interested in acquiring a yacht. He began visiting boat shows and frequenting marinas to familiarize himself with the types of vessels available. He also began reviewing the literature in boating periodicals and discussed the economics of yacht ownership with friends who were boat owners, boat brokers, and others. Smith's research revealed that the value of yachts had been appreciating since the mid-1970s. Those in the boating industry attributed the appreciation in yachts to several factors. First, the energy crises of the early and mid-1970s had caused dramatic increases in the price of fuel and other petroleum-based products. The increased fuel costs greatly increased the costs of operating motor powered vessels. As a result, many boating enthusiasts began to move away from powerboats into the more economical sailboats. The resulting increase in demand for sailboats drove up the prices of both new and used sailboats.

The energy crises also contributed to the increased cost of fiberglass, a petroleum-based product and the main raw material used in sailboat construction. The increased raw material costs caused increases in the prices of new sailboats, which also had the effect of increasing the value of used boats.

A final factor contributing to sailboat appreciation during the late 1970s was the relative weakness of the U.S. dollar vis-à-vis other currencies. This increased the cost of importing vessels constructed in foreign boatyards and in many cases made the cost of imports prohibitive. This limit on the supply of boats available, when coupled with increased demand, contributed to the appreciation in value of sailboats available on the domestic market.

Sometime during the summer of 1981, Smith approached Antonides and the Herdendorfs and proposed that they pool

their resources and acquire a yacht jointly. On December 30, 1981, petitioners jointly purchased a new 36-foot Watkins sailing sloop from Nautilus Yacht Sales (hereinafter sometimes referred to, collectively with its affiliates, as Nautilus). There were three entities involved in the Nautilus operation. Nautilus Yacht Sales was a sales entity which offered a sale/leaseback program under which a purchaser was offered an opportunity to purchase a boat from Nautilus Yacht Sales and lease it back to Nautilus Boat Club. Nautilus Boat Club offered memberships to persons who were interested in sailing but did not wish to buy a boat. For an annual membership fee, club members were entitled to use of a sailboat from the Nautilus Boat Club fleet for a prescribed number of days. West River Yacht Harbor was a condominium association which owned slips and other facilities at the site of the Nautilus Boat Club.

Antonides and Smith each acquired a one-third interest in the vessel acquired from Nautilus, with the Herdendorfs collectively acquiring the remaining one-third interest. Petitioners named the boat "Classmates." The purchase price of the boat was $94,790. Immediately upon purchase, the boat was leased back to Nautilus for a 3-year period ending December 30, 1984. The total lease payment for the 3-year period was $18,958, of which $12,639 was due on settlement, and the remaining $6,319 payable on January 15, 1982.

Under the Nautilus sale/leaseback program, Nautilus was responsible for all routine maintenance on boats leased to its charter fleet. Owners who placed their vessels in the lease program became entitled to use of the West River Yacht Harbor marina facilities and the personal use of their vessel (or a similar vessel) for 21 days per year. Additional personal usage was possible only if their boat was available.

The Nautilus leaseback program enabled purchaser/lessors to own a yacht with little or no initial cash outlay. Petitioners in this case made an initial cash deposit of $1,000 on Classmates. Instead of being applied directly to the purchase price of the boat, the $1,000 deposit, plus an additional check from Smith for $293, was used to prepay slip rentals and insurance of $403 and $840, respectively. The remaining $50 was applied to interest due on the

Herdendorf note. They then used the $12,639 of lease payments due them at settlement as part of their downpayment.

The Herdendorfs executed a $6,319 note payable to Nautilus. The note was due January 15, 1982, and was presumably to be paid with the lease payment of the same amount which was due petitioners on that date.

The remaining $75,832 of the yacht's purchase price was financed with the proceeds of a $75,832 recourse loan obtained by Antonides and Smith from the Capital City Federal Savings & Loan Association. The loan bore interest at 17 percent and was self-amortizing over a 15-year period. The loan called for a $1,166.94 monthly payment of principal and interest.

The Nautilus leaseback program was advertised as a good investment, as well as an economical way to own and enjoy a yacht. Certain Nautilus promotional material also emphasized the tax benefits allegedly available through participation in the program.

Sometime in January 1982, petitioners executed an agreement forming a partnership named "Classmate Charters." The partnership was formed to engage in all of the activities associated with the ownership and charter of the yacht Classmates. The agreement provided that the partnership was to continue for an initial period of 3 years. Antonides and Smith each owned a one-third interest in the partnership, with the Herdendorfs jointly holding the remaining one-third interest. The partnership was initially capitalized with a $414.33 contribution from each partner. A separate bank account was established which was used exclusively for partnership transactions. The agreement stated that the partners were to share profits and losses equally. Additionally, each partner was entitled to 7 days personal use of the yacht each year.

An appraisal obtained by the partners in November 1983, showed that Classmates had declined in value to $78,500. Unfortunately for petitioners, the anticipated general appreciation in yacht values failed to continue into the 1980s. This was primarily due to a fall in oil prices. This drop in oil prices caused a reversal of the shift in demand from power to sail. It also resulted in lower new boat costs

through reduced fiberglass prices. A further depressant on prices was an influx of imported boats, made more economical by the strong U.S. dollar. None of these changes had been foreseen by petitioners when they purchased Classmates in December 1981.

On December 31, 1983, Antonides sold his interest in the partnership to Smith and the Herdendorfs. The remaining partners then entered into a new agreement with Nautilus in 1985 whereby the partnership would receive a fixed percentage of any revenues generated by Nautilus through charter of the yacht. However, by this time, Nautilus had begun to experience financial difficulties which eventually resulted in its bankruptcy. Although charters were made, no funds were ever remitted to the partnership as a result of this new agreement. The partners disposed of Classmates in 1987 (either by sale or trade) for $50,000.

On its partnership return for 1982, Classmate Charters showed gross income of $6,320 and expenses of $36,235, including depreciation, for a net loss of $29,915. On his income tax return, Antonides claimed a deduction of $12,078 as his share of the Classmate Charters loss. The Smiths also claimed a $12,078 deduction on their return for 1982. Neither return gave effect to the gross income shown on the partnership return. The Herdendorfs showed a loss of $5,760 attributable to Classmate Charters on their 1982 return. They calculated their loss share by taking a one-third share of the partnership expenses (as did Antonides and the Smiths) and all of the income shown on the partnership return.

In notices of deficiency for taxable year 1982, respondent determined that the $6,320 of income on the partnership return should have been allocated to each partner equally, rather than all to the Herdendorfs. He also determined that only the $12,801 of interest expense incurred by Classmate Charters was deductible by petitioners. Thus, the allowable losses from the charter activities of Classmate Charters were redetermined as follows:

|  | Antonides | Smith | Herdendorf | Total |
|---|---|---|---|---|
| Income | $2,107 | $2,107 | $2,107 | $6,320 |
| Interest expense | 4,267 | 4,267 | 4,267 | 12,801 |
| Net deduction allowable | 2,160 | 2,160 | 2,160 | [3]6,480 |

[3]Columns do not match exactly due to rounding to whole dollars.

Additionally, respondent determined that Antonides was liable for the addition to tax for negligence provided by section 6653(a)(1) and (2). He also determined that Antonides and the Smiths were each liable for an addition to tax for substantial understatements of income tax as provided by section 6661.

OPINION

## 1. *Section 183 Issue*

Respondent does not contest the amount of the deductions claimed by petitioners in 1982 or that they were in fact incurred with respect to Classmates. Rather, he asserts that petitioners' chartering activity was an activity not engaged in for profit during the taxable year at issue. An "activity not engaged in for profit" is defined in section 183(c) as an activity other than one with respect to which deductions are allowable under section 162 or under paragraphs (1) or (2) of section 212.

If an activity is not engaged in for profit, section 183(b)(1) allows only those deductions which are not dependent on a profit motive. Section 183(b)(2) allows all other deductions which would be allowable if the activity was engaged in for profit, but only to the extent that gross income from the activity exceeds the deductions allowable under section 183(b)(1).

Deductions are allowable under section 162 for expenses of carrying on an activity which constitutes the taxpayer's trade or business if those expenses are ordinary and necessary to the conduct of the trade or business. Section 212 allows the taxpayer to deduct expenses incurred in connection with an activity engaged in for the production or collection of income, or for the management, conservation, or maintenance of property held for the production of income.

A taxpayer must show that he engaged in an activity with an actual and honest objective of making a profit in order to deduct expenses of the activity under either section 162 or 212. Sec. 1.183-2(a), Income Tax Regs.; *Beck v. Commissioner,* 85 T.C. 557, 569 (1985); *Flowers v. Commissioner,* 80 T.C. 914, 931 (1983); *Dreicer v. Commissioner,* 78

T.C. 642, 644-645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983); *Golanty v. Commissioner,* 72 T.C. 411, 425-426 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981). In this context, profit means economic profit, independent of tax savings. *Landry v. Commissioner,* 86 T.C. 1284, 1303 (1986), on appeal (5th Cir., Jan. 12, 1987); *Herrick v. Commissioner,* 85 T.C. 237, 255 (1985); *Beck v. Commissioner, supra* at 570; *Estate of Baron v. Commissioner,* 83 T.C. 542, 557-559 (1984), affd. 798 F.2d 65 (2d Cir. 1986); *Surloff v. Commissioner,* 81 T.C. 210, 233 (1983). While the expectation of making an economic profit need not be reasonable, the facts and circumstances must indicate that the taxpayer entered into the activity, or continued it, with the objective of making a profit. *Beck v. Commissioner, supra; Fox v. Commissioner,* 80 T.C. 972, 1006 (1983); *Dreicer v. Commissioner, supra.*

The burden of proof is on petitioners to show that they engaged in their boat chartering activity with the objective of realizing an economic profit. Rule 142(a). In making this determination, all relevant facts and circumstances are to be taken into account.[4] *Finoli v. Commissioner,* 86 T.C. 697, 722 (1986); *Golanty v. Commissioner, supra; Jasionowski v. Commissioner,* 66 T.C. 312, 321 (1976). Greater weight must be given to objective facts than to petitioners' mere statements of intent. Sec. 1.183-2(a), Income Tax Regs.; *Beck v. Commissioner, supra; Flowers v. Commissioner, supra; Siegel v. Commissioner,* 78 T.C. 659, 699 (1982); *Engdahl v. Commissioner,* 72 T.C. 659, 666 (1979). In cases involving partnership activities, the profit motive analysis is made at the partnership level. *Brannen v. Commissioner,* 78 T.C. 471, 505 (1982), affd. 722 F.2d 695 (11th Cir. 1984);

---

[4]Sec. 1.183-2(b), Income Tax Regs., provides a nonexclusive list of factors which should normally be considered in determining whether an activity is engaged in with the requisite profit motive. The nine factors are: (1) The manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved. No single factor, nor the existence of even a majority of the factors, is controlling, but rather it is an evaluation of all the facts and circumstances in the case, taken as a whole, which is determinative. Sec. 1.183-2(b), Income Tax Regs.; *Abramson v. Commissioner,* 86 T.C. 360, 371 (1986); *Golanty v. Commissioner,* 72 T.C. 411, 425-426 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981); *Benz v. Commissioner,* 63 T.C. 375, 382 (1974).

*Siegel v. Commissioner, supra* at 698; *Goodwin v. Commissioner,* 75 T.C. 424, 437 (1980), affd. without published opinion 691 F.2d 490 (3d Cir. 1982). After reviewing the entire record before us, we conclude that petitioners have failed to carry their burden of proving that profit was the objective of their activity.

 · · The facts which petitioners rely on. in support of their position are based almost entirely on their own self-serving testimony. Petitioners' claim—that they hoped to achieve a positive cash-flow in their charter operation within 3 to 5 years—is not supported by any break-even analysis conducted by petitioners.

The only cash-flow analysis provided by petitioners is the one prepared by Nautilus with Smith's adjustments. This projection goes out to the year 1985 and indicates a negative cash-flow in every year. While the projection does show a positive cash-flow of $1,953 in 1982, this is achieved only by including as "cash in" the $18,958 lease income without a corresponding $18,958 "cash out" for payment of this income as part of the downpayment on Classmates. Had this payment been properly reflected, petitioners would have shown a net cash-outflow of $17,005 in 1982. In 1984, the projected negative cash-flow was over $11,000, indicating that petitioners could not have anticipated making money on their charter operation at any time soon, if ever.

Petitioners also contend that they hoped the proceeds from their eventual disposition of Classmates would offset the losses incurred in the early years of their charter activity and allow them to earn an overall profit on the boat. Petitioners claim that their decision to enter the charter business was based in part upon their belief that their boat would appreciate at a rate averaging approximately 10 percent per year. In this connection, we consider the use of Classmates for charter and the holding of the vessel for appreciation to be a single "activity" within the meaning of section 183. See *Dickson v. Commissioner,* T.C. Memo. 1983-723.

The only documentary evidence petitioners presented as having provided a basis for their belief that the boat would increase 10 percent per year in value is a single Wall Street Journal article. However, we found petitioners' testimony

credible in this regard. Their contention that there was a general consensus that sailboats were appreciating, or at least maintaining their value, in the late 70s and early 80s is corroborated by numerous articles in general and sailing periodicals during that period. However, even if petitioners actually and honestly expected that their boat would appreciate in value, any such appreciation would have allowed petitioners to do little more than break even.

We cannot believe that the extremely remote and speculative possibility of profit to be derived under any of petitioners' theories was the actual motivation for their purchase and charter of Classmates. We take as our starting point the annotated cash-flow analysis provided to Smith by Nautilus. The analysis projects to the year 1985 and we therefore assume that this was the timeframe within which petitioners operated. Forty-percent appreciation over this 4-year period would result in petitioners' $94,790 asset being worth $132,706 in 1985. Our analysis indicates that even with assumed 10-percent yearly appreciation, petitioners would not even be able to cover the negative cash-flows generated in the earlier years of the charter activity:

|  | 1981 | 1982 | 1983 | 1984 | 1985 | Total |
|---|---|---|---|---|---|---|
| Downpayment | ($12,639) | ($6,319) |  |  |  | ($18,958) |
| Loan payments | - - - | (14,005) | ($14,005) | ($14,005) | ($14,005) | (56,020) |
| Other expenses | (1,200) | (3,000) | (3,090) | (3,183) | (3,278) | (13,751) |
| Lease income | 12,639 | 6,319 | - - - | - - - | 6,000 | 24,958 |
| Net cash | (1,200) | (17,005) | (17,095) | (17,188) | (11,283) | (63,771) |
| Assumed sales price of yacht |  |  |  |  | [5]132,706 |  |
| Bank loan |  |  | (75,832) |  |  |  |
| Less: Principal payments |  |  | 6,315 |  | (69,517) |  |
|   Net.sales proceeds |  |  |  |  | 63,189 |  |
|   Cash-outflow |  |  |  |  | 63,771 |  |
| Net return from chartering activity |  |  |  |  | ([6]582) |  |

We thus conclude that, even though petitioners certainly would have liked to make a profit, this was not their actual motivation in acquiring and leasing Classmates. Rather than petitioners' engaging in the charter activity with an

---

[5]Our analysis does not take into account any expenses of selling the yacht, even though Smith's Nov. 9, 1982, letter to the Herdendorfs indicates that he anticipated the possible payment of a 10-percent broker's commission on the sale.

[6]Our analysis also does not take into account the time value of money. Had we factored in the effect of not recouping cash outlays made during the period 1982-85 until the end of 1985, the charter activities profit potential would be even more dismal.

actual and honest objective of making a profit, it seems more likely that their purpose was to help defray the cost of something they wished to own for their personal enjoyment. We also note that even though petitioners were in relatively low tax brackets during 1981, the Nautilus cash-flow analysis with which they were provided indicates that they would reap significant reductions in tax liability through their participation in the Nautilus sale/leaseback program.

Chartering a yacht to others in order to afford to keep it through tax savings for one's personal enjoyment is not the same as having a profit objective. See *Martin v. Commissioner*, 50 T.C. 341, 364 (1968); *Rand v. Commissioner*, 34 T.C. 1146, 1149-1150 (1960). Petitioners are thus limited to those deductions which are allowable regardless of whether the chartering activity was engaged in for profit, i.e., the $12,801 of interest paid on the loan from Capital City Savings & Loan which has been allowed by respondent. Since gross income from the charter activity did not exceed the expenses allowable under section 183(b)(1), no deductions are allowable under section 183(b)(2).

## 2. *Section 280A Issue*

In his amended answer, respondent argues in the alternative that petitioners are not entitled to the deductions otherwise allowable under chapter 1 of the Code, except as provided in section 280A. As previously held, since section 183 applies, the only deductions allowable to petitioners are those allowable without regard to whether they were incurred in an activity conducted as a trade or business or for the production of income. See secs. 183(b)(1), 183(c). Section 280A(b) removes from the ambit of the disallowance provisions of section 280A those deductions allowable to the taxpayer without regard to their connection to his trade or business or income producing activities. We thus need not consider the application of section 280A since there are no allowable deductions upon which that section can operate.

## 3. *Partnership Allocation Issue*

The next issue for consideration is whether revenues generated by the charter activities of Classmate Charters

were properly allocated to its partners in accordance with the partnership agreement. Petitioners claim that the $6,319 of lease income received in 1982 should not have been shown on the partnership return at all, but should be treated as received by the Herdendorfs in their individual capacity. Alternatively, petitioners contend that the $6,319 of lease income should not appear on either the partnership's or the Herdendorf's 1982 returns since it was constructively received in 1981. We find no merit in this contention. Under the terms of the lease agreement with Nautilus, the partners were not entitled to receipt of this income until January 15, 1982. See *Schniers v. Commissioner,* 69 T.C. 511, 516-517 (1977).

The first step in resolving this issue is to determine whether the $6,319 of rental income is chargeable to Classmate Charters as an entity, or to the Herdendorfs. Resolution of this issue turns on whether the partnership was in existence at the time the right to receipt of the $6,319 of rental income arose.

For Federal income tax purposes, a partnership is a "syndicate, group, pool, joint venture or other unincorporated organization through or by means of which any business, financial operation, or venture is carried on, and which is not, within the meaning of this title [subtitle], a corporation or a trust or estate." Sec. 761(a).[7] A partnership comes into existence for Federal income tax purposes, "when the parties to a venture join together capital or services with the intent of conducting presently an enterprise or business." *Sparks v. Commissioner,* 87 T.C. 1279, 1282 (1986). See also *Commissioner v. Tower,* 327 U.S. 280, 286-287 (1946). There is no requirement that a formal, written agreement be executed before a partnership comes into existence. Sec. 1.761-1(c), Income Tax Regs.

We conclude that the partnership Classmate Charters was formed no later than the date on which the yacht Classmates was purchased and then leased back to Nautilus—

---

[7]We note that existence of a profit motive is not the sine qua non for classification of a group undertaking as a partnership for Federal tax purposes. *Madison Gas & Electric Co. v. Commissioner,* 72 T.C. 521, 561-562 (1979), affd. 633 F.2d 512 (7th Cir. 1980). Since neither party has argued that petitioners were mere co-owners of property rather than partners, we treat the fact that a partnership was created as having been established. See also *Brannen v. Commissioner,* 78 T.C. 471, 512 n. 16 (1982), affd. 722 F.2d 695 (11th Cir. 1984).

December 30, 1981. It was on that date that petitioners joined their resources with the intent of purchasing Classmates for use in charter activities. Indeed these were the only transactions, other than making loan payments, that petitioners would be required to enter into for the next 3 years. Although the actual partnership agreement was not drafted and signed until January 1982, we view this as merely memorializing an agreement which must have existed at the time the yacht was purchased.

We also hold that the lease agreement with Nautilus was entered into by petitioners in their capacities as partners, rather than as individuals. Only this makes sense since the generation of lease income was the reason for creation of the partnership. We thus hold that the partnership, rather than the Herdendorfs, was the recipient of the $6,319 of rental income paid by Nautilus in 1982. Each partner's distributive share of partnership income, gain, loss, deduction, or credit is determined by the partnership agreement. Sec. 704(a). Paragraph 8 of the Classmate Charters Articles of Partnership states that profits and losses generated by the partnership are to be shared in equal proportions. We thus hold for respondent in his reallocation of the $6,319 of gross rental income received by the partnership in 1982 among the parties equally.

## 4. *Negligence*

Respondent determined that the entire underpayment of tax by Antonides was attributable to his negligence, and imposed the additions to tax provided for by section 6653(a). Negligence is defined as a failure to exercise the due care that a reasonable and ordinarily prudent person would exercise under the circumstances. *Marcello v. Commissioner*, 380 F.2d 499, 506 (5th Cir. 1967). Section 6653(a)(1) imposes an addition to tax equal to 5 percent of the underpayment when any portion of the underpayment is due to negligence or intentional disregard of rules and regulations (but without intent to defraud). Section 6653(a)(2) imposes an addition to tax equal to 50 percent of the interest due on the portion of the underpayment which is attributable to negligence. Petitioner bears the burden of proving that his underpayment of tax was not attributable

to negligence. *Bixby v. Commissioner*, 58 T.C. 757, 791-792 (1972); Rule 142(a).

We find the imposition of the addition to tax for negligence on Antonides with respect to his charter activity to be inappropriate. While it seems likely that profit potential, tax shelter benefits, and personal pleasure all played some role in his decision to become involved in the charter activity, petitioner was unable to meet his burden of proving that the partnership had an actual and honest objective of making a profit from the charter activity. However, the mere fact that Antonides' proof was inadequate to support his position does not require us to find that the underpayment with respect to the charter activity was due to negligence. We note that Antonides seems to have played a rather passive role in the decision to engage in the charter activity, agreeing to become a partner only after having been solicited by Smith. Under the instant circumstances, we find that Antonides' underpayment of tax attributable to the chartering activity was not due to his negligence.

Respondent stipulated that the addition to tax for negligence was only appropriate if the section 183 issue was resolved in his favor. We take this as a concession by respondent of the negligence addition as it relates to the adjustment for the $5,439 of income from Maratech omitted from Antonides' return.

## 5. *Substantial Understatement*

Respondent determined that Antonides and the Smiths were liable for the additions to tax under section 6661. That section reads, in relevant part, as follows:

SEC. 6661. SUBSTANTIAL UNDERSTATEMENT OF LIABILITY.

(a) ADDITION TO TAX.—If there is a substantial understatement of income tax for any taxable year, there shall be added to the tax an amount equal to 25 percent of the amount of any underpayment attributable to such understatement.

(b) DEFINITION AND SPECIAL RULE.—

(1) SUBSTANTIAL UNDERSTATEMENT.—

(A) IN GENERAL.—For purposes of this section, there is a substantial understatement of income tax for any taxable year if the amount of the understatement for the taxable year exceeds the greater of—

(i) 10 percent of the tax required to be shown on the return for the taxable year, or

(ii) $5,000.

\* \* \* \* \* \* \*

(2) UNDERSTATEMENT.—

(A) IN GENERAL.—For purposes of paragraph (1), the term "Understatement" means the excess of—

(i) the amount of the tax required to be shown on the return for the taxable year, over

(ii) the amount of the tax imposed which is shown on the return, reduced by any rebate (within the meaning of section 6211(b)(2)).

(B) REDUCTION FOR UNDERSTATEMENT DUE TO POSITION OF TAXPAYER OR DISCLOSED ITEM.—The amount of the understatement under subparagraph (A) shall be reduced by that portion of the understatement which is attributable to—

(i) the tax treatment of any item by the taxpayer if there is or was substantial authority for such treatment, or

(ii) any item with respect to which the relevant facts affecting the item's tax treatment are adequately disclosed in the return or in a statement attached to the return.

Section 6661(b)(1)(A) defines a substantial understatement as one which exceeds the greater of 10 percent of the tax required to be shown on the return or $5,000. The amount of the understatement is reduced for section 6661 purposes by the portion of the understatement which is attributable to a taxpayer's treatment of an item if there is or was substantial authority for such treatment (sec. 6661(b)(2)(B)(i)), or if relevant facts affecting the tax treatment of the item are adequately disclosed on the return or in a statement attached to the return (sec. 6661(b)(2)(B)(ii)). As we outlined in *Schirmer v. Commissioner,* 89 T.C. 277, 285 (1987), the regulations prescribe circumstances in which information provided on the return will be adequate disclosure for purposes of section 6661. See secs. 1.6661-4(b) and 1.6661-4(c), Income Tax Regs.; Rev. Proc. 83-21, 1983-1 C.B. 680, applicable to returns filed in 1983 (the 1982 returns in this case were filed in 1983). Petitioners have not claimed that adequate disclosure for purposes of section 6661 was made on the individual returns for Antonides and the Smiths or the partnership return, and we consequently do not address that issue. We would observe, however, that adequate disclosure would appear to offer the opportunity of a so-called "safe harbor" in any situation other than one

involving a tax shelter (as defined in section 6661(b)(2)(C)(ii)), where substantial authority may, for a variety of reasons, be lacking. Respondent does not urge that this case involves a tax shelter within the definition contained in section 6661(b)(2)(C).

We turn then to a consideration of "substantial authority" under section 6661(b)(2)(B)(i). We must decide whether any portion of the understatement in this case is supported by substantial authority. In evaluating whether a taxpayer's position regarding treatment of a particular item is supported by substantial authority, the weight of authorities in support of the taxpayer's position must be substantial in relation to the weight of authorities supporting contrary positions. Sec. 1.6661-3(b)(1), Income Tax Regs. The substantial authority standard is less stringent than a "more likely than not" standard (that is, a greater than 50-percent likelihood of being upheld in litigation), but stricter than a reasonable basis standard (the standard which, in general, prevents imposition of the section 6653(a) negligence addition). Sec. 1.6661-3(a)(2), Income Tax Regs.

Under the regulations, in determining whether there is substantial authority for a taxpayer's position, the following authorities are considered: applicable provisions of the Internal Revenue Code and other statutory provisions; temporary and final regulations construing such statutes; court cases; administrative pronouncements (including revenue rulings and revenue procedures); tax treaties and regulations thereunder, and Treasury Department and other official explanations of such treaties; and congressional intent as reflected in committee reports, joint explanatory statements of managers included in conference committee reports, and floor statements made prior to enactment by one of a bill's managers. Sec. 1.6661-3(b)(2), Income Tax Regs. The cited regulation thus makes it clear that substantial authority here refers to legal precedents which would support the taxpayer's application of the law to a given fact or set of facts.

The weight of the authorities for the tax treatment of an item is determined by the same analysis that a court would be expected to follow in evaluating the treatment of the item. Thus, an authority is of little relevance if it is

materially distinguishable on its facts from the facts of the case at issue. Sec. 1.6661-3(b)(3), Income Tax Regs.

In the instant case, petitioners argue that substantial authority supports the tax treatment claimed by Antonides and the Smiths of the losses generated by the yacht chartering activity. Specifically, petitioners point to several cases involving yacht charter activities in which taxpayers succeeded in proving that their objective was the making of profit. Cases cited by petitioners include *Slawek v. Commissioner*, T.C. Memo. 1987-438; *Zwicky v. Commissioner*, T.C. Memo. 1984-471; *Dickson v. Commissioner*, T.C. Memo. 1983-723; *McLarney v. Commissioner*, T.C. Memo. 1982-461. Those cases, on their facts, however, are materially distinguishable from the facts herein. The taxpayers in those cases, except for *Dickson*, had not bound themselves into any lease providing the yacht owner with only fixed lease payments, regardless of the level of customer usage of the boat. Those taxpayers' potential leasing income therefore was open-ended. Petitioners, on the other hand, were in an exclusive 3-year lease with Nautilus under which all rental payments for the 3 years were fixed and known as of the purchase date of the yacht.

The taxpayer in *Dickson*, like petitioners, had an exclusive, nonvariable lease; however, the lease payments payable to the taxpayer in *Dickson* were sufficient so that, at the end of the lease, the taxpayer would have broken even (approximately) if the yacht's value had remained constant.[8] In *Dickson*, as in the instant case, the taxpayer honestly expected the yacht to appreciate 8 to 10 percent per year while he owned it. That expected appreciation is what gave the yachting activity in *Dickson* its profit motive. In the instant case, however, the expected appreciation, at best, only would have offset the net economic losses that would accrue to petitioners by virtue of the terms of the lease

---

[8]Mr. Dickson was due annual payments of $7,725 for 4 years, or $30,900 in total. His insurance costs amounted to $1,200 per year, or $4,800 for the 4-year period, and he paid $3,500 for delivery, commissioning, and sea trials. Moorage and maintenance expenses of the boat were to be borne by the lessee. Mr. Dickson's bank note to finance the yacht purchase bore interest at 12.02 percent per annum. Depending upon whether the compounding period of the note was monthly (as the numbers would lead us to believe) or only annually, Mr. Dickson would pay interest on the note over its first 4 years in the approximate amounts of either $21,900, or $23,350, respectively. The facts of *Dickson v. Commissioner*, T.C. Memo. 1983-723, thus indicate that the net result of the leasing transaction (before depreciation) over the 4-year term would have been between a gain of $700 and a loss of $750.

with Nautilus; the expected appreciation would not have generated a net profit from the yachting activity. In short, the fact that the leasing activities in *Dickson,* as contemplated by the taxpayer when he purchased the yacht, would approximately break even differs materially from the facts in the instant case, where the leasing transaction was expected to generate substantial *economic* losses.

The cases cited by petitioners thus do not constitute substantial authority. We also are not familiar with other authority which might provide substantial authority. Therefore, when all the facts of the instant case and the authorities are considered, the tax treatment of the yachting activity by Antonides and the Smiths is not supported by any substantial authority, and we hold that section 6661(b)(2)(B)(i) does not shelter them from liability for additions to tax pursuant to section 6661.[9]

In addition, petitioners do not argue that there was substantial authority for Antonides' failure to include the conceded $5,439 adjustment in taxable income. We therefore find there was no substantial authority for that omission, and find that Antonides is liable for the section 6661 addition on this amount, to the extent he is at all liable under section 6661.

A computation under Rule 155 will be required to determine, among other things, whether the respective understatements of Antonides and of the Smiths exceed the greater of 10 percent of the tax required to be shown on the respective returns or $5,000, taking into account concessions made by respondent as to items unrelated to the section 183 issue. The contention of the Smiths that respondent used an incorrect tax rate in his deficiency calculation also will be resolved in the Rule 155 computation.

To reflect the foregoing,

*Decisions will be entered under Rule 155.*

---

[9]Except for *McLarney v. Commissioner,* T.C. Memo. 1982-461, the opinions in the cases cited by petitioners as substantial authority for their position were not issued until after the returns in the instant case were filed. By virtue of our holding that those cited cases are materially distinguishable, on their facts, from the instant case, we need not address the question of whether the substantial authority cited by a taxpayer must have existed at the time the return in issue was filed. See sec. 1.6661-3(b)(4)(iii), Income Tax Regs. See also sec. 6661(b)(2)(B)(i).

Reviewed by the Court.

NIMS, CHABOT, PARKER, WHITAKER, KÖRNER, SHIELDS, HAMBLEN, COHEN, CLAPP, SWIFT, JACOBS, WRIGHT, WILLIAMS, RUWE, WHALEN, and COLVIN, *JJ.*, agree with this opinion.

GERBER and PARR, *JJ.*, did not participate in the consideration of this case.