CARL I. SCHWARTZ AND SHIRLEY SCHWARTZ, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Schwartz v. Commissioner
Docket No. 30361-89
United States Tax Court
T.C. Memo 1991-380; 1991 Tax Ct. Memo LEXIS 445; 62 T.C.M. (CCH) 419; T.C.M. (RIA) 91380; August 12, 1991, Filed *445 Decision will be entered under Rule 155. Burton H. Schwartz, for the petitioners. Dennis G. Driscoll, Patricia A. Evans, and Oksana O. Xenos, for the respondent. JACOBS, Judge. JACOBS
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined deficiencies and additions to tax in petitioners' Federal income taxes as follows: [SEE TABLE IN ORIGINAL] *446 In August 1981, petitioner Carl I. Schwartz purchased a 46-foot sailing yacht and concurrently leased it to a charter company. Petitioners claimed deductions and an investment tax credit with respect to the purchase and lease of the yacht, which respondent disallowed. The issues for decision are: (1) Whether Carl I. Schwartz' chartering activity was engaged in for profit; (2) whether petitioners are entitled to the claimed investment tax credit with respect to the purchase of the yacht; (3) whether petitioners are liable for additions to tax for negligence or intentional disregard of rules and regulations; and (4) whether petitioners are liable for additions to tax for substantial understatement of income tax. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference. Carl I. Schwartz (hereinafter petitioner) and Shirley Schwartz, husband and wife, resided in Grand Blanc, Michigan, at the time they filed their petition. They filed joint Federal income tax returns for all years in issue. Petitioner is a dentist. From 1981 through 1986, he practiced dentistry through *447 a professional corporation, receiving wages from his professional corporation as follows: 1981
$ 225,000
1982
225,000
1983
247,867
1984
275,000
1985
348,467
1986
285,000
At the time of trial, petitioner owned 10 dental practices which generated over $ 5.5 million in annual revenues. Over the years, petitioner made numerous and substantial investments, including: the purchase and sale of listed securities; the purchase of real estate; the construction and lease of a 14,000-square-foot office building; the ownership of a machinery leasing company; the purchase and lease of a 50,000-square-foot office building; the purchase, restoration, and sale of automobiles; and the purchase of 11 dental practices throughout Michigan. In addition, he was the chief executive officer and owner of a plastics company that generated approximately $ 6 million in annual revenues. In August 1981, while petitioner was browsing along the Traverse City, Michigan waterfront and admiring the sailboats in the harbor, Ed McKnew (McKnew) from Harbor West Sales, Inc. (Harbor West) approached him and inquired whether he would be interested in purchasing a boat. (Prior to this time, petitioner had *448 never owned a boat and had no knowledge of sailing.) Petitioner told McKnew that while he "loved" boats, he could not justify buying one since he did not have the time to use it. McKnew then asked petitioner if he would be interested in an investment program involving the purchase and chartering of a boat. After petitioner expressed an interest in discussing such a program, McKnew took him to the office of Joe Beyerle (Beyerle), the owner of Marakesh Charters, Ltd. (Marakesh). McKnew, Beyerle, and petitioner discussed a charter investment program "designed to provide maximum tax advantages to those individuals or corporations seeking to offset annual tax liabilities" which involved buying a sailboat from Harbor West and concurrently leasing it to Marakesh for charter on Lake Michigan. At that meeting, they discussed the business of chartering in general and the viability of the charter business in northern Michigan in particular. Beyerle and McKnew recommended that petitioner purchase a 46-foot sailing yacht (rather than a 41-foot one as he had been considering) because of the demand for charter of a boat of that size on Lake Michigan. Petitioner was further advised that boats *449 under 40 feet had appreciated 10 percent each year, whereas boats over 40 feet had appreciated between 10 and 20 percent each year. Petitioner thereafter met with his accountant, Richard Shade (Shade), and Beyerle. During this meeting, petitioner and Shade reviewed Marakesh's promotional materials which noted the tax advantages of chartering and included 3-year projected cash flow analyses of owning and chartering a 30-foot, a 36-foot, and a 40-foot sailing yacht. If tax advantages were disregarded, in each instance, the materials revealed that an investment in such a program would result in losses for each of the 3 years. The materials did not indicate that the investment program would ever result in an economic profit. Shade informed petitioner that Marakesh's charter investment program could produce an economic profit if the yacht appreciated in value. Prior to reaching a decision with respect to the Marakesh charter investment program, petitioner read a few articles on chartering, and discussed the reputation of Marakesh, as well as the viability of Marakesh's charter investment program, with William Otto, a loan officer at Michigan National Bank who had made loans to other *450 participants in Marakesh's charter investment program. In addition, he spoke with an individual who owned a yacht in Florida, although at trial he could not recall this person's name. Petitioner estimated the potential income that could be earned from chartering. He assumed that the boat could be rented 12 weeks during the peak sailing period and would appreciate 10 percent a year in value. (The charter season for sailing on Lake Michigan is mid-April through mid-October although the prime months are June, July, and August. During the peak sailing period, the average weekly charter rental for sailboats over 40 feet was between $ 1,500 and $ 1,600.) His projections relied heavily on the receipt of tax benefits, including the investment tax credit. On August 13, 1981, petitioner signed a Memorandum of Agreement to purchase a 46-foot Morgan ketch rig sailboat (named the Sabra), which was specifically designed for charter, from Harbor West for $ 184,315. Petitioner made a $ 37,015 cash deposit and borrowed the $ 147,300 balance from Michigan National Bank. Petitioner subsequently received an $ 8,000 rebate. Petitioner concurrently executed a lease agreement with Marakesh, *451 effective August 1, 1981, through October 1, 1984, pursuant to which he agreed to lease the Sabra to Marakesh for charter on Lake Michigan. Initially, Marakesh paid petitioner a guaranteed rental of $ 960 per month for 12 months. For the subsequent charter season, petitioner opted not to take the guarantee which Marakesh offered; rather, all charter income earned after the first 12 months of the lease was split on a 60 percent to petitioner-40 percent to Marakesh basis. While the Sabra was placed for charter with Marakesh, Marakesh maintained all operational records and sent petitioner a monthly statement of receipts and expenses, together with the payment due him. Petitioner was unable to produce at trial monthly operational reports for August 1982 through April 1983, and October 1983 through April 1984. Further, on one occasion, Marakesh was 12 months late in tendering payment to petitioner. Petitioners personally used the Sabra on the following days: [SEE TABLE IN ORIGINAL] Between 1981 and 1986, the price of boats, *452 both new and used, dramatically declined. By late 1984, demand for charter boats in the Lake Michigan area also declined. In late 1984 or early 1985, Marakesh went out of business. In early 1985, petitioner decided to sell his yacht. Accordingly, he had the Sabra transported to Brennan's Marine, Bay City, Michigan, where it was listed for sale. In late August 1986, the Sabra was moved to the Traverse Bay Yacht Brokerage in Traverse City, Michigan, where it was listed for sale. In the summer of 1987, petitioner sold the Sabra for $ 100,000. On their income tax returns, petitioners reported income, expenses, and losses from chartering the Sabra, as follows: [SEE TABLE IN ORIGINAL] *453 Petitioners depreciated the Sabra under the accelerated cost recovery system using a 5-year recovery period. In addition, they claimed a $ 12,863 investment tax credit with respect to the purchase of the Sabra in 1981 and a $ 4,769 investment tax credit carryback to 1978. OPINION Section 183) Based on his determination that petitioner's chartering of the Sabra was not engaged in for profit pursuant to section 183, [2] respondent disallowed substantially all the deductions (except interest) petitioners claimed with respect to such activity. *454 Section 183(c) defines an "activity not engaged in for profit" as an activity other than one with respect to which deductions are allowable under section 162 or under paragraphs (1) and (2) of section 212. To deduct expenses under either section 162 or section 212, the taxpayer must show that he engaged in the activity with an actual and honest objective of making a profit. Sec. 1.183-2(a), Income Tax Regs.; Antonides v. Commissioner, 91 T.C. 686, 693 (1988), affd. 893 F.2d 656 (4th Cir. 1990). In this context, "profit" means economic profit independent of tax savings. Antonides v. Commissioner, supra.While the taxpayer's profit expectation need not be reasonable, pursuant to the holding of the Court of Appeals for the 6th Circuit, the circuit to which this case is appealable, the facts and circumstances must indicate that the taxpayer entered into the activity "for the primary purpose and dominant hope and intent of realizing a profit." Hayden v. Commissioner, 889 F.2d 1548, 1552 (6th Cir. 1989), affg. a Memorandum Opinion of this Court. See also Sec. 1.183-2(a), Income Tax Regs.; Golanty v. Commissioner, 72 T.C. 411, 425-426 (1979), *455 affd. without published opinion 647 F.2d 170 (9th Cir. 1981). Whether a taxpayer has the requisite profit objective is a question of fact, the burden of proof for which is on the taxpayer. Rule 142(a); Hayden v. Commissioner, supra. In determining whether the taxpayer has met his burden, we consider all relevant facts and circumstances, Golanty v. Commissioner, supra at 426, and give greater weight to objective facts than to the taxpayer's statement of intent. Engdahl v. Commissioner, 72 T.C. 659, 666 (1979). Section 1.183-2(b), Income Tax Regs., contains a nonexclusive list of factors for determining whether an activity is engaged in for profit. [3] No single factor, nor the existence of even a majority of the factors, is controlling. Sec. 1.183-2(b), Income Tax Regs.; Antonides v. Commissioner, 91 T.C. at 694 n.4. *456 Petitioner has failed to convince us that obtaining an economic profit was his primary purpose and dominant hope and intent in purchasing and chartering the Sabra. To the contrary, we conclude that petitioner's primary purpose and dominant hope and intent in purchasing and chartering the Sabra was to obtain and utilize the tax benefits available therefrom in order to shelter his dental income. Expertise of the Taxpayer or his Advisers
Careful investigations of a potential business to insure the best chance for profitability strongly indicate an objective to engage in the activity for profit. See Jackson v. Commissioner, 59 T.C. 312, 316 (1972). While a formal market study is not required, a basic investigation of the factors that would affect profit is. Burger v. Commissioner, T.C. Memo 1985-523, affd. 809 F.2d 355 (7th Cir. 1987). Petitioner is an experienced and astute investor. Given his self-avowed lack of knowledge of sailing and the yacht-chartering business, together with the fact that the purchase of the Sabra was "the biggest investment [he] had ever made on [his own]," petitioner's investigation *457 prior to his purchase of the Sabra takes on special significance as a factor in reflecting his true objective in purchasing the Sabra. In this regard, we note that petitioner did minimal research as to the profitability of the charter business. He read but a few articles on yachting and sought the advice of only those persons who stood to profit if he purchased a boat (McKnew) and chartered it (Beyerle) and those who had little or no expertise in determining the profitability of chartering on Lake Michigan (Shade, Otto, and an individual who owned a yacht in Florida). On the other hand, petitioner thoroughly investigated the potential tax benefits from purchasing and chartering a sailboat. He discussed the tax advantages of chartering with Shade and Beyerle, and reviewed Marakesh's promotional materials which focused heavily on the tax aspects of the transaction and emphasized that Marakesh's charter investment program was "designed to provide maximum tax advantages to those individuals or corporations seeking to offset tax liabilities." Further, we are mindful that (1) the promotional materials indicated the larger the sailboat, the larger the tax savings, and (2) petitioner *458 purchased a 46-foot sailboat which became the largest sailboat in Marakesh's charter fleet. History of Income or Losses With Respect to the Activity and Taxpayer's Expectation of Appreciation
While losses incurred during the formative years of an activity are not necessarily fatal to a section 183 determination in the taxpayer's favor, the ultimate goal of an activity engaged in for profit must be to realize an overall profit. Bessenyey v. Commissioner, 45 T.C. 261, 274 (1965), affd. 379 F.2d 252 (2d Cir. 1967). Losses which continue beyond the operation's startup period are evidence that the taxpayer did not engage in the activity for profit, unless such losses occurred because of unforeseen or fortuitous circumstances. Sec. 1.183-2(b)(6), Income Tax Regs. Here, for each of the 6 years petitioner owned the Sabra, petitioners reported a substantial loss. Petitioner testified with regard to the financial analysis he made prior to purchasing the Sabra. His analysis relied heavily on his benefitting from an investment tax credit of approximately $ 17,500. And, it was the receipt of the tax credit, and other tax benefits, which *459 justified his cash outlay. Petitioner's self-serving statement that he hoped to achieve an economic profit from the charter operations is not supported by his own financial projections. Disregarding tax benefits, and considering the substantial principal and interest payments on the financed portion of the purchase price, petitioner's analysis projected a negative cash flow each year. On the other hand, the losses generated from the charter operations sheltered petitioner's dental income. For purposes of section 183, profit encompasses appreciation. Sec. 1.183-2(b)(4), Income Tax Regs. We are mindful that one may achieve an overall economic profit from an activity, even if no operational profit is derived, when appreciation of the assets of the activity (here, the Sabra) is taken into account. Sec. 1.1832(b)(4), Income Tax Regs.
Petitioner stated that he expected the Sabra to appreciate in value 10 percent a year and that such appreciation would offset any operational losses. He claimed that he intended to own the Sabra for 15 years, and at the end of said years, the Sabra would be worth approximately $ 300,000. (We note that the annual appreciation rate *460 for a $ 176,315 investment which increases in value to $ 300,000 after 15 years is approximately 4.7 percent rather than 10 percent.) We do not find petitioner's testimony regarding his projected length of ownership credible. In his annual financial projections, petitioner amortized the investment tax credit for the Sabra over a 5-year period, and he used a 5-year recovery period in calculating depreciation deductions. We believe petitioner intended to own the Sabra for 5 years rather than 15 years. Although petitioner may have hoped the Sabra would appreciate in value sufficiently to offset operational losses, petitioner's financial projections show that such a speculative possibility was not the actual motivation for his purchase. See Antonides v. Commissioner, supra at 696. Even had the Sabra appreciated 10 percent annually as petitioner hoped, petitioner would not have earned a profit (disregarding tax savings) after 5 years, as demonstrated by the following:
[SEE TABLE IN ORIGINAL] *461 Petitioners argue that the losses sustained were due to an unforeseen circumstance, i.e., the decline in the market for sailing yachts. We do not accept this argument. Had petitioner made a bona fide evaluation of the economics of this investment, his own financial projections would have indicated that the chartering activity would not produce an economic profit absent tax benefits. Furthermore, assuming arguendo that the market decline was an unforeseen circumstance, even if the Sabra appreciated 10 percent each year, the activity nonetheless would have *462 been unprofitable. Financial Status of Taxpayer
During the years in issue, petitioner had substantial income from dentistry. Between 1981 and 1986, petitioner derived approximately $ 255,400 in deductions and $ 17,632 in tax credits from the chartering activity. Petitioner's economic status was such that he could afford to sustain this loss activity and at the same time benefit from the resulting tax advantages. Manner in Which the Taxpayer Carries on the Activity
Normally, when a charter company undertakes recordkeeping responsibility, such as Marakesh did in this case, the keeping of complete and accurate books and records loses significance in determining whether an activity is engaged in for profit. Nonetheless, petitioners did not produce statements for 15 months and Marakesh was 12 months late in tendering a payment to petitioner, both of which give some credence to respondent's contention that petitioner did not carry on his chartering activity in a businesslike manner. Time and Effort Expended by Taxpayer in Carrying on the Activity
Due to the fact that petitioner immediately placed the Sabra for charter with Marakesh, the amount of time petitioner *463 devoted to his chartering activity loses significance in determining whether such activity is one engaged in for profit. Nonetheless, we are mindful that during the years in issue, petitioner operated a full-time dental practice, and did no recordkeeping. Thus, it appears he did not spend any significant time or effort pursuing the chartering of the Sabra. Whether Elements of Personal Pleasure Are Involved
The presence of personal motives in carrying on the activity coupled with evidence of recreational use of the boat would weigh against petitioner. Even though petitioners used the Sabra in 1982, 1983, and 1984, we are satisfied that petitioner did not enter into this transaction because of his desire to own a sailing yacht for personal pleasure. Although the instant case does not involve an activity entered into for personal pleasure, section 183 is not limited to so-called hobby losses. The profit objective analysis of section 183 applies to tax shelter investments as well. See Beck v. Commissioner, 85 T.C. 557 (1985). To summarize, although petitioner would have liked to make a profit from the chartering activity, he did not engage in *464 the yacht-chartering activity with the primary purpose and dominant hope and intent of realizing an economic profit. Hence, petitioners may deduct the expenses incurred in the charter activity only as provided by section 183. Respondent's determination with respect to this issue is sustained. Investment Tax Credit
Section 38 provides that a credit is allowed to a taxpayer for qualified investment in certain property. The credit is allowable for property with respect to which depreciation (or amortization in lieu of depreciation) is allowable and which has a useful life of 3 years or more. Sec. 48(a)(1). Depreciation is allowable on property used in a trade or business or held for the production of income. Sec. 167(a). Our determination that petitioner's yacht-chartering activity was not engaged in with the objective of making a profit is dispositive of this issue. Finoli v. Commissioner, 86 T.C. 697, 744-745 (1986). Negligence
Respondent determined that petitioners' entire underpayment of tax was attributable to negligence and imposed additions to tax for each year. Negligence is defined as a failure to exercise the due care that a reasonable *465 and ordinarily prudent person would under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985). Considering all the facts and circumstances of this case, we find that petitioners' claim of losses with respect to petitioner's chartering activity was not due to negligence; hence, respondent's determination of negligence is not sustained. Substantial Understatement
Respondent determined that petitioners' understatements of income tax were substantial and imposed an addition to tax equal to 25 percent of the underpayment attributable to such understatements pursuant to section 6661. That section defines a "substantial understatement" as one which exceeds the greater of 10 percent of the tax required to be shown on the return or $ 5,000. Sec. 6661(b)(1)(A). The amount of the understatement is reduced for section 6661 purposes by the portion of the understatement which is attributable to the taxpayer's treatment of an item if there is substantial authority for such treatment, or if relevant facts affecting the item's tax treatment are adequately disclosed in the return or in a statement attached to the return. Sec. 6661(b)(2)(B). In evaluating *466 whether the taxpayer's position regarding treatment of a particular item is supported by substantial authority, the weight of authorities in support of the taxpayer's position must be substantial in relation to the weight of authorities supporting contrary positions. The substantial authority standard is less stringent than a "more likely than not standard," but stricter than a reasonable basis standard. Sec. 1.6661-3(a)(2), Income Tax Regs.
The weight of authorities for the tax treatment of an item is determined by the same analysis that a court would be expected to follow in evaluating the treatment of the item. Thus, an authority is of little relevance if it is materially distinguishable on its facts from the facts of the case at issue. Sec. 1.6661-3(b)(3), Income Tax Regs.
Petitioners argue that they adequately disclosed on their returns the relevant facts regarding the chartering activity for purposes of section 6661. We disagree. Petitioners' returns included Schedule C, Profit (or Loss) From Business or Profession, which listed the income and deductions with respect to the chartering activity. Nowhere on the return was respondent apprised of facts which would enable *467 him to determine whether petitioner engaged in the chartering activity for profit. Petitioners also argue that there is substantial authority for the deductions taken with respect to the yacht-chartering activity. Specifically, petitioners point to several cases involving yacht-chartering activities in which taxpayers succeeded in proving their profit objective. Petitioners cite Feldman v. Commissioner, T.C. Memo 1988-126. In Feldman, the taxpayer discontinued operations and put his boat up for sale after less than one charter season. Therein, we found that the most important factor evidencing the taxpayer's profit objective was the speed with which he ceased operating once he determined that it would not be profitable. Consequently, we concluded that tax motives were not uppermost in the taxpayer's mind. Here, despite substantial losses each year, petitioner continued his chartering operations until the tax benefits for doing so expired. Petitioners also cite Pryor v. Commissioner, T.C. Memo 1991-109, as substantial authority. The facts in Pryor are distinguishable from those in the instant case. In Pryor, we found the *468 taxpayer had the requisite profit objective. In reaching this conclusion, we were persuaded by the fact that the taxpayer had prepared a 12-year conservative projection of anticipated revenues and expenses showing the possibility of an overall operational profit. Here, petitioner's financial projections showed that if tax benefits were disregarded, an operational profit was not possible. Cases cited by petitioners also include Zwicky v. Commissioner, T.C. Memo 1984-471; Dickson v. Commissioner, T.C. Memo 1983-723; McLarney v. Commissioner, T.C. Memo 1982-461; and Antonides v. Commissioner, supra.[4] In Antonides, the taxpayers also argued that the aforementioned cases constituted substantial authority for their claimed deductions in connection with a yacht purchase and chartering program. We concluded therein that the cited cases were materially distinguishable on their facts and thus did not constitute substantial authority for the taxpayers' position. We can discern no material distinction between the facts herein and those in Antonides v. Commissioner, supra, *469 which would impact on our determination regarding section 6661. For the same reasons expressed in Antonides, supra, we herein conclude that Zwicky v. Commissioner, supra, Dickson v. Commissioner, supra, and McLarney v. Commissioner, supra, do not constitute substantial authority for petitioners' position.[5]
*470 Respondent's determination with respect to the addition to tax under section 6661 is sustained.
To reflect the foregoing, Decision will be entered under Rule 155. Footnotes
2. SEC. 183. ACTIVITIES NOT ENGAGED IN FOR PROFIT. (a) GENERAL RULE. -- In the case of an activity engaged in by an individual * * *, if such activity is not engaged in for profit, no deduction attributable to such activity shall be allowed under this chapter except as provided in this section. (b) DEDUCTIONS ALLOWABLE. -- In the case of an activity not engaged in for profit to which subsection (a) applies, there shall be allowed -- (1) the deductions which would be allowable under this chapter for the taxable year without regard to whether or not such activity is engaged in for profit, and (2) a deduction equal to the amount of the deductions which would be allowable under this chapter for the taxable year only if such activity were engaged in for profit, but only to the extent that the gross income derived from such activity for the taxable year exceeds the deductions allowable by reason of paragraph (1).↩
3. Sec. 1.183-2(b), Income Tax Regs., lists some of the factors to be considered in determining whether an activity is engaged in for profit. The factors listed in the regulation are as follows: (1) Manner in which the taxpayer carries on the activity. * * * (2) The expertise of the taxpayer or his advisors. * * * (3) The time and effort expended by the taxpayer in carrying on the activity. * * * (4) Expectation that assets used in activity may appreciate in value. * * * (5) The success of the taxpayer in carrying on other similar or dissimilar activities. * * * (6) The taxpayer's history of income or losses with respect to the activity. * * * (7) The amount of occasional profits, if any, which are earned. * * * (8) The financial status of the taxpayer. * * * (9) Elements of personal pleasure or recreation. * * *↩
4. Petitioners erroneously cited Antonides v. Commissioner, 91 T.C. 686 (1988), affd. 893 F.2d 656 (4th Cir. 1990), as substantial authority for their position. In Antonides↩, the taxpayers were not successful in claiming that they engaged in yacht chartering for profit. 5. By virtue of our holding that the cited cases are factually distinguishable from the instant case, we need not address the question of whether the substantial authority cited by a taxpayer must have existed at the time the return in issue was filed. See sec. 6661(b)(2)(B)(i); sec. 1.6661-3(b)(4)(iii), Income Tax Regs. See also Antonides v. Commissioner, supra↩ at 704 n.9.