T.C. Memo. 2000-29

UNITED STATES TAX COURT

G.B. DATA SYSTEMS, INC., Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 24958-97.                  Filed January 21, 2000.

<u>William E. Frantz</u> and <u>John E. James</u>, for petitioner.

<u>Nancy C. McCurley</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

CHIECHI, <u>Judge</u>:  Respondent determined for the year ended
January 31, 1994, a deficiency in petitioner's Federal income tax
(tax) in the amount of $399,152 and an addition to tax under
section 6651(a)(1)[1] and an accuracy-related penalty under section

_____

[1]All section references are to the Internal Revenue Code in
(continued...)

6662(a) in the amounts of $14,495 and $79,830, respectively.

The issues remaining for decision are:

(1) Is petitioner entitled to deduct for the year at issue a claimed royalty expense in the amount of $1,158,084? We hold that it is not.

(2) Is petitioner liable for the year at issue for the accuracy-related penalty under section 6662(a)? We hold that it is.

FINDINGS OF FACT[2]

Some of the facts have been stipulated and are so found.

Petitioner had its principal place of business in Marina del Rey, California, at the time the petition was filed.

Petitioner, which was incorporated on July 1, 1988, used the accrual method of accounting for its taxable year ended January 31, 1994, the year at issue. A. Glenn Braswell (Mr. Braswell) owned all of the stock of petitioner. He also owned all of the stock of certain other corporations.[3] (We shall refer to some or

_____

[1](...continued) effect for the year at issue. All Rule references are to the Tax Court Rules of Practice and Procedure.

[2]Unless otherwise indicated or needed for clarity, our Findings of Fact and Opinion pertain to Feb. 9, 1999, the date of the trial in this case, and not to petitioner's taxable year ended Jan. 31, 1994, the year at issue. In this regard, the record is poorly developed as to relevant facts pertaining to the year at issue.

[3]Mr. Braswell's spouse owned one share of stock in one of
(continued...)

all of the corporations in which Mr. Braswell owned stock as Braswell companies.)  Since at least 1994 to the date of the trial in this case, most of the Braswell companies were engaged in what they referred, and we shall refer, to as "specialized direct marketing activities".[4]  (We shall refer to the Braswell companies that were engaged in such specialized direct marketing activities as the Braswell sales corporations.)  Those activities, which were intended to sell nutritional supplements to individuals living in the United States, consisted of mailing directly to those individuals advertisements that described and offered those supplements for sale (advertising material).  That advertising material included letters, brochures, and so-called 16-page mailers.  Since at least 1994 to the date of the trial in this case, certain of the Braswell sales corporations devoted their specialized direct marketing activities to what they referred to as the front-end business, i.e., to prospective customers, and certain of those corporations devoted their specialized direct marketing activities to what they referred to

---

[3](...continued)
those other corporations.

[4]As for the remaining Braswell companies, one of them published a magazine, another owned certain assets not disclosed by the record that were utilized by one or more Braswell companies, another marketed products directly to medical professionals throughout the world, and another sold certain books written by professionals through direct response advertising such as newspapers and magazines.

as the back-end business, i.e., to existing customers.

Since around 1989 until a date not established by the record in this case, Vita Industries, Inc. (Vita), which was incorporated in January 1989, was one of the Braswell sales corporations and also provided to the other Braswell sales corporations certain unspecified management services and other services not established by the record herein.[5]  Beginning in 1993, Vita entered a winding-down stage during which its activities were limited primarily to collecting its receivables and paying its liabilities and expenses.

In October 1992, Vita entered into an agreement with Campaign Media Corporation (CMC), which was wholly owned by Chase Revel (Mr. Revel) at the time that agreement was executed.  (We shall refer to that agreement as the Vita-CMC agreement.)  The Vita-CMC agreement, which was in force until sometime in 1996, was to be binding on and inure to the benefit of the legal representatives, successors, and assigns of CMC and Vita. Pursuant to that agreement, CMC agreed to create advertising material to promote Vita's products and any other products that Vita designated.  In return, Vita agreed "to pay CMC royalties of 5% of the gross sales (less refunds, credit card chargebacks and sales taxes) generated by any advertising material created by

---

[5]It is not clear from the record whether Vita provided such services to other Braswell companies.

CMC." Vita further agreed

> to pay said royalties to CMC within 10 working days after the end of the first week said advertising materials generate sales and continue to pay said royalties on a weekly basis thereafter.

In order to determine the amount of royalties payable under the Vita-CMC agreement, that agreement required Vita

> to provide a list of the sales sources and gross sales for each source along with each royalty payment. Said sales sources shall be defined as "key codes" for direct mail and space advertisements and 800 [telephone] number assignments.

Gross sales upon which royalties were payable under the Vita-CMC agreement were determined by using the data processing system employed by the Braswell sales corporations in order to track gross sales by means of product codes as well as media codes that appeared on the advertising material that CMC created for Vita's products and other products designated by Vita.

Mr. Revel concluded shortly after the Vita-CMC agreement was executed that Mr. Braswell was not the type of individual who involved himself in the bookkeeping and accounting operations of the Braswell companies. Consequently, whenever Mr. Revel had any questions under the Vita-CMC agreement about the royalty payments made to CMC thereunder, he addressed those questions to the employees working in the bookkeeping, sales, and/or accounting departments of those Braswell companies who compiled the figures needed to determine the royalties due CMC under the Vita-CMC agreement.

Throughout the period during which the Vita-CMC agreement was in force, Mr. Revel dealt with Mr. Braswell, and it did not matter to Mr. Revel from which of the Braswell companies CMC received checks for the royalties due CMC under that agreement. On various dates not established by the record herein throughout the period during which the Vita-CMC agreement was in force, CMC received checks from different Braswell companies, including Vita and petitioner, in amounts not established by that record for royalties due to CMC under that agreement. As described below, the checks that CMC received from petitioner during that period were issued by petitioner as the disbursing agent for the Braswell sales corporations whose products were promoted by advertising material that CMC created pursuant to the Vita-CMC agreement.

Since a date not established by the record in this case until the date of the trial herein, the Braswell sales corporations used petitioner as a service provider.[6] As such, petitioner provided to those corporations personnel, payroll, and certain other services, the nature of which is not established by the record in this case. During that same period, the Braswell sales corporations utilized a centralized cash control system

---

[6]It is not clear from the record whether other Braswell companies used petitioner as a service provider.

under which petitioner served as the disbursing agent for them.[7] As such, petitioner maintained approximately five or six bank accounts on behalf of those corporations, including an investment account, a payroll account, and other disbursement accounts. The Braswell sales corporations for which petitioner served as the disbursing agent deposited certain funds into the payroll and other disbursement bank accounts that petitioner maintained on their behalf. Thereafter, petitioner disbursed those funds on behalf of those corporations in order to make payments, inter alia, for the respective payroll and other liabilities and debts that those corporations incurred. Petitioner's disbursements of funds on behalf of those corporations included disbursements of funds that were payable to CMC under the Vita-CMC agreement.

In return for the services that it provided to the Braswell sales corporations over a period of time not established by the record herein, petitioner received an administrative fee from those corporations. That administrative fee, which was the source of most of petitioner's income during that period, was calculated on the basis of a formula which, although not specifically described in the record in this case, took into account the services that petitioner provided to each of the Braswell sales corporations and the volume of business that each of those

---

[7]It is not clear from the record whether other Braswell companies used petitioner as a disbursing agent.

corporations generated.

Since around 1989 to the time of the trial in this case, Robert Miller (Mr. Miller), a certified public accountant, prepared the tax returns of, and provided certain consulting and accounting services to, one or more of the Braswell companies. Around August or September 1994, Christine Wu (Ms. Wu), who served as petitioner's controller approximately from 1993 until 1995, sent Mr. Miller financial statements for petitioner's fiscal year ended January 31, 1994, in order to enable Mr. Miller to prepare petitioner's Form 1120, U.S. Corporation Income Tax Return, for its taxable year ended on the same date (Form 1120). Thereafter, during September 1994, approximately eight months after the close of petitioner's fiscal and taxable years ended January 31, 1994, Ms. Wu sent Mr. Miller a document entitled "G.B. DATA SYSTEMS & CONTROLLED GROUP PRODUCT USAGE 2/1/93-1/31/94" (purported product usage document). Ms. Wu sent that document to Mr. Miller in order to have him (1) prepare and book on petitioner's behalf certain accounting entries and (2) reflect such accounting entries in the Form 1120 that he was preparing for petitioner.

Based upon the purported product usage document that Mr. Miller received from Ms. Wu, Mr. Miller prepared adjusting journal entries in September 1994 that debited royalty expense and credited royalties payable in the amount of $1,158,084. The

amount of those entries was the same as the amount shown on the purported product usage document as the last entry under the column headed "NET TOTAL (IN BOTTLES)". (We shall refer to the adjusting journal entries prepared by Mr. Miller on the basis of the purported product usage document as the royalty adjusting journal entries.) After having prepared the royalty adjusting journal entries, Mr. Miller completed preparation of petitioner's Form 1120 for its taxable year ended January 31, 1994, based on those entries and petitioner's financial statements for the fiscal year ended on the same date. Thereafter, but prior to booking the royalty adjusting journal entries in petitioner's books and prior to filing petitioner's return for the year at issue, Mr. Miller confirmed with Mr. Braswell the correctness of booking those entries. When Mr. Miller booked the royalty adjusting journal entries in petitioner's books, he included an explanation in those entries that he was making them "per AGB", i.e., per A. Glenn Braswell.

Petitioner claimed, inter alia, a royalty expense deduction in the amount of $1,158,084 in the Form 1120 that it filed for the year at issue.

In the notice of deficiency (notice) issued to petitioner for the year at issue, respondent determined that petitioner erroneously deducted $1,158,084 as a royalty expense and increased petitioner's income for that year by that amount.

Respondent also determined that petitioner was liable for that taxable year for the accuracy-related penalty under section 6662(a).

OPINION

Petitioner bears the burden of proving that the determinations in the notice are erroneous. See Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).

Claimed Royalty Expense Deduction

Petitioner contends that it is entitled under section 162(a) to deduct for the year at issue the royalty expense claimed in the Form 1120 that it filed for that year. Respondent counters that petitioner has failed to establish that it satisfies the requirements of section 162(a). Respondent also contends that petitioner has failed to prove that it satisfies the all events test with respect to the claimed royalty expense. See sec. 461(a) and (h). On the record before us, we agree with respondent.

Section 162(a) allows a taxpayer to deduct all the ordinary and necessary expenses that such taxpayer paid or incurred during the taxable year in carrying on such taxpayer's trade or business. Deductions are strictly a matter of legislative grace, and a taxpayer must meet the specific statutory requirements for any deduction claimed. See INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992). The determination of whether an expenditure

satisfies the requirements for deductibility under section 162 is a question of fact. See Commissioner v. Heininger, 320 U.S. 467, 475 (1943).

In support of its position that it is entitled to deduct for the year at issue the claimed royalty expense, petitioner contends, inter alia, that it provided sales and marketing assistance to the Braswell sales corporations, that Vita assigned its rights and obligations under the Vita-CMC agreement to petitioner, and that petitioner was obligated to pay a 5-percent royalty to CMC under that agreement. On the record before us, we find that petitioner has failed to establish those (and other) factual contentions as facts.[8]

On the record before us, we find that petitioner has failed to establish that it incurred the claimed royalty expense during the year at issue (or during any other year). We further find that, assuming arguendo that petitioner had shown that it incurred that expense during the year at issue, petitioner has failed to establish (1) that such expense is an ordinary and necessary expense that it incurred during that year in carrying on its trade or business, see sec. 162(a), and (2) that the all

---

[8]Assuming arguendo that petitioner had established those factual contentions as facts, we find on the record before us that it has not shown that those factual contentions pertain to the year at issue. See supra note 2.

events test is met with respect to that expense, see sec. 461(a) and (h).[9]

Based on our examination of the entire record in this case, we find that petitioner has failed to show that it is entitled to deduct for the year at issue the claimed royalty expense.[10]

---

[9]We note that petitioner attempted to introduce the purported product usage document into evidence in order to prove the truth of the matters asserted therein. The Court sustained respondent's hearsay objection to the admission of that document into evidence. However, the Court did admit the purported product usage document into evidence solely for the limited purposes of showing that Mr. Miller relied on that document in order to prepare both the royalty adjusting journal entries and petitioner's tax return for the year at issue.

We also note that petitioner claims that the purported product usage document reflects the "royalties payable to CMC based on the number of bottles of product sold (and the average price per bottle) attributable to CMC's direct-mail pieces." On the instant record, we reject petitioner's claim. In addition, we have serious reservations about the reliability of the purported product usage document. We note first that Ms. Wu gave that document to Mr. Miller in September 1994, approximately eight months after the close of petitioner's taxable year ended Jan. 31, 1994. Although the purported product usage document purports to cover that year, the document shows only an "ESTIMATE FOR: 2/1/93-7/31/93", the first six months of that year. Furthermore, the purported product usage document is a purported summary of underlying records relating to the royalty expense payable to CMC under the Vita-CMC agreement. However, the record in the instant case is devoid of any evidence (such as corporate records of the Braswell sales corporations showing gross sales on which the royalty payable to CMC under the Vita-CMC agreement was calculated, canceled checks, general ledgers, accrual workpapers, invoices, expense or payable journals, etc.) which establishes that the purported product usage document is accurate. Nor does the record contain any evidence establishing that petitioner was liable for the year at issue (or any other year) for the royalties due CMC under the Vita-CMC agreement.

[10]We have considered, and find to be without merit and/or irrelevant, all of the arguments and contentions of petitioner
(continued...)

- 13 -

Accordingly, we sustain respondent's determination disallowing the royalty expense deduction that petitioner claimed in its tax return for that year.

Accuracy-Related Penalty Under Section 6662(a)

Respondent determined that petitioner is liable for the year at issue for the accuracy-related penalty under section 6662(a). Petitioner contends that respondent's determination is wrong because (1) "there is no underpayment of tax"; (2) "there is no evidence that it was negligent or disregarded rules or regulations"; and (3) "there is substantial authority for the deduction of the Royalty Expense". Although it is not altogether clear, petitioner also seems to contend that it is not liable for the accuracy-related penalty because it relied on its accountant, Mr. Miller, in deducting the claimed royalty expense in the Form 1120 that it filed for the year at issue.

------

[10](...continued)
that are not discussed herein, including the following alternative argument of petitioner:

> Even assuming _arguendo_ that the Royalty Expense was an expense of the other Related Entities [i.e., the Braswell sales corporations], the assumption by Petitioner of the marketing functions including the engagement of CMC's services and ultimate liability for those services substantiates a deductible business expense to Petitioner under the principles articulated in _Dinardo v. Commissioner_, 22 T.C. 430 (1954).

We find _Dinardo_ and the other cases on which petitioner relies to support its alternative argument to be distinguishable from the instant case and petitioner's reliance on those cases to be misplaced.

Section 6662(a) imposes an accuracy-related penalty equal to 20 percent of the tax resulting from a substantial understatement of income tax. An understatement is substantial in the case of a corporation if the amount of the understatement for the taxable year exceeds the greater of 10 percent of the tax required to be shown in the tax return for that year or $10,000. See sec. 6662(d)(1)(A) and (B). An understatement is equal to the excess of the amount of tax required to be shown in the tax return over the amount of tax shown in such return. See sec. 6662(d)(2)(A).

The amount of the understatement is reduced to the extent that it is attributable to, inter alia, an item for which there is or was substantial authority. See sec. 6662(d)(2)(B)(i). In order to satisfy the substantial authority standard of section 6662(d)(2)(B)(i), petitioner must show that the weight of author-ities supporting its position is substantial in relation to those supporting a contrary position. See Antonides v. Commissioner, 91 T.C. 686, 702 (1988), affd. 893 F.2d 656 (4th Cir. 1990); sec. 1.6662-4(d)(3)(i), Income Tax Regs. The substantial authority standard is not so stringent that a taxpayer's treatment must be one that is ultimately upheld in litigation or that has a greater than 50-percent likelihood of being sustained in litigation. See sec. 1.6662-4(d)(2), Income Tax Regs. A taxpayer may have substantial authority for a position even where it is supported only by a well-reasoned construction of the pertinent statutory

provision as applied to the relevant facts. See sec. 1.6662-4(d)(3)(ii), Income Tax Regs. There may be substantial authority for more than one position with respect to the same item. See sec. 1.6662-4(d)(3)(i), Income Tax Regs.

The accuracy-related penalty under section 6662(a) does not apply to any portion of an underpayment if it is shown that there was reasonable cause for such portion and that the taxpayer acted in good faith. See sec. 6664(c)(1). The determination of whether a taxpayer acted with reasonable cause and in good faith depends on the pertinent facts and circumstances, including the taxpayer's efforts to assess his or her proper tax liability, the knowledge and experience of the taxpayer, and the reliance on the advice of a professional, such as an accountant. See sec. 1.6664-4(b)(1), Income Tax Regs. In the case of claimed reliance on the accountant who prepared the taxpayer's tax return, the taxpayer must establish that correct information was provided to the accountant and that the item incorrectly claimed or reported in the return was the result of the accountant's error. See Ma-Tran Corp. v. Commissioner, 70 T.C. 158, 173 (1978).

On the instant record, we reject petitioner's contention that respondent's determination under section 6662(a) is wrong because "there is no underpayment of tax". We have held on that record that petitioner is not entitled to deduct for the year at issue the claimed royalty expense. Consequently, petitioner has

not shown that there is no underpayment of tax for that year.

On the record before us, we also reject petitioner's contention that respondent's determination under section 6662(a) is wrong because "there is no evidence that it was negligent or disregarded rules or regulations". We note first that respondent determined that petitioner is liable under section 6662(a) because of section 6662(b), i.e., because of a substantial understatement of income tax. Respondent did not determine that petitioner is liable under section 6662(a) because of negligence or disregard of rules or regulations under section 6662(b)(1). In any event, on the record in this case, we find that petitioner has failed to show that it was not negligent and did not disregard rules or regulations in claiming the royalty expense deduction in its Form 1120 for the year at issue.

We further find on the record before us that petitioner has failed to establish that it acted with reasonable cause and in good faith in claiming the royalty expense deduction. In this connection, to the extent that petitioner is claiming that it acted with reasonable cause and in good faith in claiming the royalty expense deduction in its tax return for the year at issue because it relied on Mr. Miller who prepared that return, we reject any such contention. Petitioner has not established on the instant record that it provided correct information to Mr. Miller with respect to that claimed deduction. The record shows

that during 1994, approximately eight months after the close of petitioner's fiscal and taxable years ended January 31, 1994, Ms. Wu, petitioner's controller, sent Mr. Miller the purported product usage document.[11]  She provided that document to Mr. Miller in order to have him (1) prepare and book on petitioner's behalf certain accounting entries and (2) reflect such accounting entries in the Form 1120 that he was preparing on petitioner's behalf for the year at issue.  Based on the purported product usage document, Mr. Miller prepared adjusting journal entries in September 1994 that debited royalty expense and credited royal-ties payable in the amount of $1,158,084.  The amount of those entries was the same as the amount shown on the purported product usage document as the last entry under the column headed "NET TOTAL (IN BOTTLES)".  After having prepared the royalty adjusting journal entries, Mr. Miller completed preparation of petitioner's Form 1120 for the year at issue based upon those entries and petitioner's financial statements for the fiscal year ended January 31, 1994.  Thereafter, but prior to booking the royalty adjusting journal entries in petitioner's books and prior to filing petitioner's return for the year at issue, Mr. Miller confirmed with Mr. Braswell the correctness of booking those

---

[11]See supra note 9.

entries.[12]  On the record before us, we find that petitioner has failed to establish that it provided correct information to Mr. Miller when Ms. Wu gave him the purported product usage document. See Ma-Tran Corp. v. Commissioner, 70 T.C. at 173.

On the instant record, we also reject petitioner's contention that respondent's determination under section 6662(a) is wrong because "there is substantial authority for the deduction of the Royalty Expense".  On that record, we find that all of the authorities on which petitioner relies to support its position regarding the claimed royalty expense deduction are distinguishable from the instant case.  Consequently, petitioner's reliance on those authorities is misplaced.

---

[12]Mr. Miller testified, and we found as a fact, that he confirmed with Mr. Braswell the correctness of booking the royalty adjusting journal entries.  On the record before us, we find that Mr. Miller's confirming with Mr. Braswell the correctness of booking those entries is not equivalent to Mr. Miller's undertaking due diligence with respect to those entries such that Mr. Miller assured himself of the correctness of those entries. We note in this connection that Mr. Revel testified, and we found as facts, the following:  Shortly after the Vita-CMC agreement was executed, Mr. Revel concluded that Mr. Braswell was not the type of individual who involved himself in the bookkeeping and accounting operations of the Braswell companies.  Consequently, whenever Mr. Revel had any questions under the Vita-CMC agreement about the royalty payments made to CMC thereunder, he addressed those questions to the employees working in the bookkeeping, sales, and/or accounting departments of those Braswell companies who compiled the figures needed to determine the royalties due CMC under that agreement.  On the record before us, we find that petitioner has not shown that Mr. Braswell, whom petitioner did not call as a witness at trial, was in a position to confirm the correctness of booking the royalty adjusting journal entries other than by expressing his personal opinion to Mr. Miller that those entries were correct.

Based on our examination of the entire record before us, we find that petitioner has failed to establish error in respondent's determination that it is liable for the year at issue for the accuracy-related penalty under section 6662(a).  Consequently, we sustain that determination.

To reflect the foregoing and the concession of respondent,

<u>Decision will be entered</u>

<u>under Rule 155</u>.