T.C. Memo. 2004-1


UNITED STATES TAX COURT


INTERTAN, INC., Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 9599-02.              Filed January 5, 2004.


Raymond P. Wexler and David C. Kung, for petitioner.

James M. Cascino, David B. Flassing, and John J. Comeau, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


CHIECHI, Judge:  Respondent determined to impose a

$1,000,819[1] accuracy-related penalty under section 6662(a)[2] on petitioner for its taxable year ended June 30, 1993.  The only issue for decision is whether petitioner is liable for that penalty.  We hold that it is.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

Petitioner is a Delaware corporation with its principal office in Ontario, Canada.

At all relevant times, petitioner, which was formed in 1986 as part of a reorganization and spinoff of Tandy Corporation, was a holding company.  At such times, petitioner owned stock in various wholly owned foreign operating subsidiaries (petitioner's operating subsidiaries), including InterTAN Canada Ltd. (ITC), a Canadian corporation, InterTAN U.K. Limited (InterTAN U.K.), and InterTAN Europe S.A. (InterTAN Europe).

On May 22, 1990, petitioner, as guarantor, and ITC, InterTAN U.K., and InterTAN Europe, as borrowers, entered into an agreement entitled "REVOLVING CREDIT AND TERM LOAN AGREEMENT" (the 1990 bank agreement) with a syndicate of banks (bank syndicate), as lenders.  During a period of time not disclosed by the record,

---

[1]Unless otherwise noted, currency amounts are denominated in United States dollars.

[2]All section references are to the Internal Revenue Code in effect for the year at issue.  All Rule references are to the Tax Court Rules of Practice and Procedure.

the bank syndicate extended a revolving credit facility (revolving credit facility) to certain of petitioner's operating subsidiaries and extended a $40 million term loan (term loan) to its operating subsidiary ITC. As of June 30, 1993, petitioner's operating subsidiaries were in default under the 1990 bank agreement, and fr76,000,000 (approximately $14,179,000) under the revolving credit facility and $40 million under the term loan were due and payable.[3]

On June 25, 1992, petitioner executed a document entitled "GUARANTEE AND POSTPONEMENT OF CLAIM" (guarantee and assignment agreement). The guarantee and assignment agreement provided in pertinent part:

> FOR VALUABLE CONSIDERATION, receipt hereof is hereby acknowledged, the undersigned and each of them (if more than one)[4] hereby jointly and severally guarantee(s) payment on demand to Royal Bank of Canada (hereinafter called the "Bank") of all debts and liabilities, present or future, direct or indirect, absolute or contingent, matured or not, at any time owing by InterTAN Canada Ltd. (hereinafter called the "customer") [ITC] to the Bank or remaining unpaid by the customer to the Bank, heretofore or hereafter incurred or arising and whether incurred by or arising from agreement or dealings between the Bank and the customer or by or from agreement or dealings with any third party by which the Bank may be or become in any manner whatsoever a creditor of the customer or however otherwise incurred or arising anywhere within or outside the country [Canada] where this guarantee is executed and

---

[3]The record does not disclose whether petitioner was liable as of June 30, 1993, as guarantor under the bank agreement.

[4]Petitioner was the only signatory to the guarantee and assignment.

whether the customer be bound alone or with another or others and whether as principal or surety (such debts and liabilities being hereinafter called the "liabilities"); the liability of the undersigned hereunder being limited to the sum of Twenty-One Million Canadian (C$21,000,000.00) Dollars [approximately $16,382,100 on June 30, 1993] together with interest * * *

AND THE UNDERSIGNED AND EACH OF THEM (IF MORE THAN ONE) HEREBY JOINTLY AND SEVERALLY AGREE(S) WITH THE BANK AS FOLLOWS:

    *      *      *      *      *      *      *

(5)  All indebtedness and liability, present and future, of the customer to the undersigned [petitioner] or any of them are hereby assigned to the Bank and postponed to the liabilities, and all moneys received by the undersigned * * * shall be received in trust for the Bank and forthwith upon receipt shall be paid over to the Bank, the whole without in any way limiting or lessening the liability of the undersigned under the foregoing guarantee; and this assignment and postponement is independent of the said guarantee and shall remain in full effect notwithstanding that the liability of the undersigned or any of them under the said guarantee may be extinct.  The term "Liabilities", as previously defined, for purposes of the postponement feature provided by this agreement, and this section in particular, includes any funds advanced or held at the disposal of the customer under any line(s) of credit.

At some point between July 1 and October 22, 1992, it was determined that petitioner's anticipated Federal income tax (tax) for its tax year ended June 30, 1993, would be approximately $4.1 million.  Petitioner retained Price Waterhouse to review its tax planning options and to make recommendations to minimize petitioner's anticipated tax for that year (Price Waterhouse's review and recommendation).

Steve Wolf (Mr. Wolf) was the Price Waterhouse partner

responsible for Price Waterhouse's review and recommendation. Bruce Thorpe (Mr. Thorpe) was the senior manager assigned to Price Waterhouse's review and recommendation. Dale Bond (Mr. Bond) was a senior associate assigned to Price Waterhouse's review and recommendation and worked under the supervision of Mr. Thorpe. Douglas Saunders (Mr. Saunders), who worked in Price Waterhouse's office in Mississauga, Ontario (Mississauga office),[5] assisted Mr. Bond in Price Waterhouse's review and recommendation. Mr. Saunders continued to provide assistance in Price Waterhouse's review and recommendation after he joined petitioner in March 1993 as vice president and controller.[6]

As part of Price Waterhouse's review and recommendation, Price Waterhouse conducted a study of ITC's earnings and profits (ITC's E&P study). ITC's E&P study was necessary in order to

_____

[5]In 1970, Mr. Saunders began working for Price Waterhouse as a staff assistant in its Toronto office. He became a staff accountant in 1971, a senior staff accountant in 1973, a supervisor in 1975, a manager in 1977, and a partner in 1980. After becoming a manager in 1977, Mr. Saunders transferred to Price Waterhouse's Mississauga office. During his tenure at Price Waterhouse, Mr. Saunders was involved in dividend planning for multinational clients. In that role, Mr. Saunders reviewed proposed transactions of such clients in order to identify any potential Canadian tax issues, such as the Canadian nonresident withholding tax on dividends. Mr. Saunders did not provide any advice about the United States tax consequences of any such proposed transactions.

[6]Mr. Saunders remained as vice president and controller of petitioner until his retirement. The record does not disclose the precise date on which Mr. Saunders retired from petitioner. As of the time of the trial in this case, Mr. Saunders was working for petitioner under a three-year consulting arrangement.

determine whether ITC had sufficient earnings and profits to pay a dividend to petitioner that would generate sufficient foreign tax credits to minimize petitioner's anticipated tax liability for its taxable year ended June 30, 1993. ITC's E&P study was very complex and time-consuming.[7]

On January 13, 1993, Mr. Bond prepared on behalf of Mr. Thorpe a Price Waterhouse interoffice memorandum addressed to Cullen Duke of Price Waterhouse's Houston office (January 13, 1993 interoffice memorandum) regarding the viability of ITC's paying a dividend to petitioner. Mr. Thorpe reviewed and approved that memorandum. The January 13, 1993 interoffice memorandum stated in pertinent part:

> Our planning idea involves paying another dividend from InterTAN Canada [ITC] to generate deemed paid credits that the U.S. parent [petitioner] can use to offset the tax on the Subpart F income. Since InterTAN Canada will have a deficit in its post-1986 E&P pool, the dividend will have to be paid out of pre-1987 E&P. When a foreign corporation pays a dividend when there is a deficit in its post-1986 E&P pool, Notice 87-54 requires the deficit be carried back to offset E&P in pre-1987 years. If InterTAN Canada's deficit in its post-1986 E&P pool is within a certain range, InterTAN Canada will be able to pay a small dividend out of 1985 E&P and bring up approximately $8 million of deemed paid foreign taxes. If the deficit in the post-1986 E&P pool is too small, the effective tax rate on the 1985 E&P that remains after carryback of the deficit

---

[7]The complexity of ITC's E&P study related, inter alia, to a deficit in ITC's post-1986 earnings and profits pool and certain losses of ITC that had been carried back to its prior taxable years and had thereby created refunds. Such refunds complicated the calculation of ITC's post-1986 foreign income taxes and post-1986 undistributed earnings.

will be too low for the planning strategy to work.  If the deficit in the pool is too large, the carryback will eliminate all of the 1985 E&P.

With our current projections for the fiscal year 1993 loss, the planning idea appears to be viable, but it relies on taking a position that we feel is unclear. InterTAN Canada has filed for a $17 million (Canadian) refund due to the carryback of the fiscal year 1992 loss.  We have accrued the refund as a receivable and increased the 1992 E&P for the amount of the refund. Regulations §1.905-3T discusses adjustments to the E&P pool for refunds <u>received</u>.  However, Revenue Ruling 64-146 states that for purposes of paying dividends, a refund due to the carryback of a net operating loss increases the E&P of the loss year.  Relying upon Revenue Ruling 64-146 and accruing the refund related to the 1992 loss will put the deficit in the post-1986 E&P pool at a level that will make the planning strategy possible.

On April 22, 1993, Mr. Saunders, who was at that time petitioner's vice president and corporate controller, had a meeting (April 22, 1993 meeting) with Mr. Wolf, Mr. Thorpe, and Mr. Bond.  Mr. Thorpe prepared a written summary of that meeting dated April 22, 1993 (April 22, 1993 meeting summary).  The April 22, 1993 meeting summary stated in pertinent part under the heading "PLANNING IDEAS":

> Avoid withholding tax in Canada by making dividend a repayment of paid-in capital.  We must first create some paid-in capital.  This can possibly be done by having ITI [petitioner] contribute a $30 million note * * * from Canada [ITC] to Canada.  Canada will then pay the dividend and ITI will make another loan to Canada.  The IRS shouldn't really care because the U.S. tax result is the same as if the planning had not been done.  Doug will look into the Canadian tax issues.  We need to clear all this with MTC [Price Waterhouse's Multi-State Consulting group].

On June 15, 1993, Mr. Bond prepared on behalf of Mr. Thorpe

a memorandum addressed to Keith Wettlaufer (Mr. Wettlaufer), senior vice president of petitioner and of ITC for finance and administration (June 15, 1993 memorandum). Mr. Thorpe reviewed and initialed that memorandum. The June 15, 1993 memorandum set forth Price Waterhouse's suggestions as to the steps necessary to effect a dividend from ITC to petitioner that would avoid Canadian withholding tax and generate sufficient foreign tax credits to minimize petitioner's anticipated tax liability for its taxable year ended June 30, 1993. The June 15, 1993 memorandum stated:

> As you requested, this memorandum outlines the steps we feel are necessary to pay a dividend from InterTAN Canada Ltd (Canada) [ITC] to InterTAN, Inc. (ITI) [petitioner] and avoid the Canadian withholding tax.
>
> 1. Prior to paying the dividend, Canada should repay all or a portion of the note payable to ITI.
>
> 2. ITI should then make a cash contribution to Canada. The purpose of this step is to increase Canada's paid in capital so the dividend can be considered a return of capital for Canadian tax purposes. This step should also be completed prior to paying the dividend.
>
> 3. Canada should pay the dividend on or before June 30, 1993.
>
> 4. During the 1st quarter of the next fiscal year ITI can make a new loan to Canada.
>
> We feel that the steps outlined above are necessary to help prevent the Internal Revenue Service from reclassifying the transaction as something other than a dividend and disallowing ITI's deemed paid foreign tax credits associated with the dividend. We also feel

that varying the dollar amounts involved in the various steps by a significant amount (say $1 million) will help reduce exposure.  The actual amounts to be paid will be determined after final projections are completed.  It is our understanding from previous conversations with Doug Saunders that this transaction will avoid the Canadian withholding tax.

On June 15, 1993, the June 15, 1993 memorandum was sent by facsimile to Mr. Wettlaufer.  On June 24, 1993, a copy of the June 15, 1993 memorandum was sent by facsimile to Mr. Saunders who was in Paris, France.

After reviewing the June 15, 1993 memorandum, Mr. Saunders suggested certain changes to the steps of the proposed transaction outlined in that memorandum.  Mr. Saunders suggested that, instead of contributing cash to ITC, petitioner should purchase preferred stock from ITC and ITC should redeem that preferred stock.  Mr. Saunders made that suggestion because he was concerned that the contribution of cash described in the June 15, 1993 memorandum would not result in paid-in capital for Canadian withholding tax purposes.  In that event, the payment of a dividend by ITC to petitioner would have the undesirable result of triggering the imposition of such a tax.

Mr. Bond prepared a memorandum to petitioner's tax file dated June 28, 1993 (June 28, 1993 file memorandum).  That memorandum incorporated the suggestion made by Mr. Saunders to avoid imposition of the Canadian withholding tax.  The June 28, 1993 file memorandum stated in pertinent part:

We have recommended to Doug Saunders that InterTAN Canada Ltd. (Canada) [ITC] pay a dividend of $20 million (U.S.) to InterTAN, Inc. (ITI) [petitioner]. Our recommendation was based upon a number of scenarios regarding Canada's current year loss and the balance in Canada's post-1986 pool of earnings and profits (E&P). We have considered the dividend's consequences based upon E&P calculated under what we consider to be the correct methods as well as E&P calculated consistently with the methods used in prior years, some of which we believe to be improper. Our calculations and recommendation are based upon the Company's best estimates of income (loss) for Canada and ITI available at this time.

With a $20 million dividend from Canada, ITI's U.S. tax for the fiscal year ending June 30, 1993 will be approximately $1.2 million. Without the dividend and the benefit of the associated deemed paid foreign tax credits, ITI's U.S. tax liability will be approximately $4.9 million. In the "best case" dividend scenario, ITI will have approximately $3.3 million of excess credits.

\*     \*     \*     \*     \*     \*     \*

In order to avoid the Canadian withholding tax, the Company plans to structure the transaction as a return of capital for Canadian tax purposes while still being considered a dividend for U.S. tax purposes. The Company plans to take the following action:

1.  Canada will borrow $20 million (U.S.) from the bank and repay a portion of its debt owed to ITI.

2.  ITI will use the $20 million to purchase a new class of preferred stock issued by Canada.

3.  Canada will redeem the preferred stock for $20 million. **It is imperative that this step be accomplished before the end of the fiscal year.**

4.  After the end of the fiscal year, ITI will make a new loan to Canada.

Doug Saunders believes this will permit the Company to avoid the Canadian withholding tax since the transfer of funds to the U.S. should not constitute a dividend for Canadian tax purposes. Whereas, the U.S. tax laws rely more on substance, the Canadian tax laws rely heavily on form.

Sometime after June 15, 1993, and before June 28, 1993, Mr. Bond prepared a memorandum to petitioner's tax file (Mr. Bond's draft June 1993 file memorandum).[8] Mr. Bond's draft June 1993 file memorandum, which was not finalized until July 9, 1993, stated in pertinent part:

During the fiscal year ending June 30, 1993, Canada [ITC] will pay a dividend to ITI [petitioner]. It may be possible to avoid Canadian withholding tax on the dividend if the paid-up capital of Canada can be increased prior to the payment of the dividend. In order to increase Canada's paid-up capital before paying the dividend the transaction will be accomplished according to the following steps:

1. Canada will repay the loan from ITI.

2. ITI will recontribute the cash to Canada.

3. Canada will pay the dividend.

4. ITI will make a new loan to Canada.

\* \* \* \* \* \* \*

**CONCLUSIONS**

1. The various steps involved in the transaction should be respected for U.S. tax purposes. However, it will be beneficial to spread the steps over time and vary the amounts involved in each step.

---

[8]Mr. Saunders did not review Mr. Bond's draft June 1993 file memorandum prior to the trial in this case.

\*      \*      \*      \*      \*      \*      \*

**DISCUSSION AND ANALYSIS**

1.  The dividend from Canada is expected to make sig-
    nificant deemed paid foreign tax credits available
    to ITI.  Therefore, it is reasonable to expect the
    IRS to review the transaction.  Under the step
    transaction doctrine, the IRS may be able to chal-
    lenge the validity of the dividend and the deemed
    paid foreign tax credits with two arguments.

    The economic situations of both ITI and Canada are
    the same after transaction [sic] as they were
    before the transaction.  Canada has an obligation
    due to ITI both before and after the transaction.
    In addition, the cash ends up back in Canada after
    ITI makes the new loan.  Therefore, the IRS may
    attempt to take a position stating that the entire
    transaction is simply a sham undertaken to gener-
    ate deemed paid foreign tax credits for ITI.  To
    the extent the amounts in each step of the trans-
    action are comparable and the length of time laps-
    ing between each step is short, the IRS will be
    able to build a better case for this position.

    To gain a better understanding of the likelihood
    of the IRS challenging the transaction under the
    step transaction theory, we contacted Larry
    Portnoy and Tom Bretz/PW-WNTS who helped develop
    the series of steps to accomplish the transaction.
    They did not think there would be a problem with
    the transaction structured in this manner.  Tom
    Bretz also suggested using different dollar
    amounts in each step of the transaction.  He also
    mentioned spreading the steps out over some length
    of time.  In particular, he thought it important
    to make the new loan after the end of the fiscal
    year.

On June 30, 1993, prior to the actions described below which

took place on that date, ITC's account, number 302-8529-6 (ITC's

Royal Bank account), at the Royal Bank of Canada (Royal Bank) had

a balance of $687,499.91. On July 2, 1993,[9] after the actions described below which took place on June 30 and July 2, 1993, ITC's Royal Bank account balance was the same amount as it was on June 30, 1993, except for reductions attributable to an overdraft interest charge[10] and the clearing of checks unrelated to the actions described below. The balance in petitioner's Royal Bank account, number 302-0402-4 (petitioner's Royal Bank account), was the same before and after the actions described below.

On June 30, 1993, Royal Bank received a letter (June 30, 1993 letter) from Louis G. Neumann (Mr. Neumann), petitioner's vice president, secretary, and general counsel and ITC's vice president and secretary. The June 30, 1993 letter stated in pertinent part:

> In confirmation of our recent conversation it is hereby requested that you affect [sic] the following transactions on behalf of InterTAN Inc. [petitioner] and its subsidiary InterTAN Canada Ltd [ITC]:
>
> 1.   The sum of US$20,000,000.00 is to be advanced to InterTAN Canada Ltd. by Royal Bank and deposited to account number 302-8529-6.
>
> 2.   The enclosed cheque [dated June 29, 1993] in the sum of US$20,000,000.00 drawn on account number 302-8529-6 [ITC's Royal Bank account] and made payable to InterTAN Inc. is to be deposited in InterTAN's account number 302-0402-4 [petitioner's

---

[9]July 1, 1993, was Canada Day, a federal and bank holiday in Canada.

[10]The $3,552.67 overdraft interest charged to ITC on July 2, 1993, was reversed on July 16, 1993, and new overdraft interest charges in the amounts of $101.48 and $12,211.91 were imposed.

Royal Bank account] in repayment of a loan.

3.  InterTAN's enclosed cheque [dated June 30, 1993] in the amount of US$20,000,000.00 is to be deposited into account number 302-8529-6 in combination for the issuance of InterTAN Canada Ltd. preferred shares.

4.  The enclosed cheque [dated June 29, 1993] in the amount of [US]$20,000,000.00 drawn on account number 302-8529-6 is to then be deposited in InterTAN's account number 302-0402-4 in payment for the redemption of 200,000 InterTAN Canada Ltd. preferred shares.

On June 30, 1993, pursuant to the June 30, 1993 letter, the following actions occurred:

1.  A check dated June 29, 1993, drawn upon ITC's Royal Bank account and payable to petitioner in the amount of $20 million, was presented to Royal Bank. Pursuant to the June 30, 1993 letter, Royal Bank deposited that check into petitioner's Royal Bank account. Royal Bank honored that check, which resulted in an overdraft of $19,379,772.65 in ITC's Royal Bank account (ITC's overdraft) as of the close of business on June 30, 1993. Royal Bank permitted ITC's overdraft because: (1) Pursuant to the guarantee and assignment agreement, all indebtedness and liabilities of ITC to petitioner were assigned to Royal Bank (assignment) and were postponed to any debt and liabilities of ITC to Royal Bank, including any funds advanced under any line of credit by Royal Bank to ITC (postponement), and petitioner was required to hold in trust for and pay to Royal Bank any money that it received from ITC; (2) petitioner and ITC made a commitment to

Royal Bank that the $20 million withdrawn from ITC's Royal Bank account and deposited into petitioner's Royal Bank account on June 30, 1993, would be redeposited into ITC's Royal Bank account on July 2, 1993, the first Canadian federal and bank business day after June 30, 1993, in order to satisfy ITC's overdraft; and (3) pursuant to the guarantee and assignment agreement, petitioner guaranteed ITC's overdraft to the extent of $16,382,100.[11] As part of the commitment of petitioner and of ITC to redeposit into ITC's Royal Bank account on July 2, 1993, the $20 million check dated June 29, 1993, and drawn on ITC's Royal Bank account and deposited into petitioner's Royal Bank account on June 30, 1993, petitioner agreed to return that $20 million to ITC in order to enable ITC to satisfy ITC's overdraft.

2.  A check dated June 30, 1993, drawn upon petitioner's Royal Bank account at Royal Bank and payable to ITC in the amount of $20 million, was presented to Royal Bank.  Pursuant to the June 30, 1993 letter, Royal Bank deposited that check into ITC's Royal Bank account.

3.  A check dated June 29, 1993, drawn upon ITC's Royal Bank account at Royal Bank and payable to petitioner in the amount of $20 million, was presented to Royal Bank.  Pursuant to the June

---

[11]Pursuant to the guarantee and assignment agreement, the assignment and postponement were independent of petitioner's guarantee under such agreement and were to remain in full force and effect even though the liability of petitioner as guarantor under that agreement may have been extinct.

30, 1993 letter, Royal Bank deposited that check into petitioner's Royal Bank account.

On July 2, 1993, Royal Bank received a letter (July 2, 1993 letter) from Mr. Neumann. The July 2, 1993 letter stated in pertinent part:

> Would you please accomplish the following on behalf of InterTAN Inc. [petitioner] and its wholly owned subsidiary InterTAN Canada Ltd. [ITC]:
>
> 1.  The enclosed cheque in the amount of US$20,000,000.00 drawn on InterTAN Inc. account number 302-0402-4 [petitioner's Royal Bank account] is to be deposited in InterTAN Canada Ltd. account number 302-8529-6 as a loan from InterTAN Inc. to InterTAN Canada Ltd.
>
> 2.  Withdraw the sum of US$20,000,000.00 from the account of InterTAN Canada Ltd. account number 302-8529-6 to satisfy an overdraft owing to Royal Bank by InterTAN Canada Ltd.

On July 2, 1993, pursuant to the July 2, 1993 letter, the following actions occurred:

4.  The check enclosed with the July 2, 1993 letter that was drawn upon petitioner's Royal Bank account at Royal Bank and payable to ITC in the amount of $20 million was presented to Royal Bank. Pursuant to the July 2, 1993 letter, Royal Bank deposited that check into ITC's Royal Bank account.

5.  Royal Bank debited ITC's Royal Bank account in the amount of $20 million, which ITC had received from petitioner on July 2, 1993, as described above as action 4, in order to satisfy ITC's overdraft.

(We shall refer collectively to the above-described actions 1 through 5 as the disputed transaction and individually as steps 1, 2, 3, 4, or 5 as the case may be.)

On March 15, 1994, petitioner filed Form 1120, U.S. Corporation Income Tax Return, for its taxable year ended June 30, 1993 (petitioner's 1993 return), with the Internal Revenue Service Center in Austin, Texas. In that return, petitioner reported dividends received of $52,486,578, of which $20 million was the dividend that petitioner reported it received from ITC, and foreign dividend gross-up under section 78 of $18,295,867.[12] Petitioner claimed total tax (1) before foreign tax credits of $18,696,569 and (2) after foreign tax credits of $1,146,387.[13] Schedule C, Dividends and Special Deductions (petitioner's 1993 Schedule C), of petitioner's 1993 return reported a dividend of $20 million and a foreign dividend gross-up under section 78 of $18,236,696. In Schedule J, Tax Computation, of petitioner's 1993 return, petitioner claimed foreign tax credits of $18,540,543, of which $18,236,696 was attributable to the $20 million dividend that petitioner reported it received from ITC in

[12]The foreign dividend gross-up under sec. 78 of $18,295,867 claimed in petitioner's 1993 return included foreign dividend gross-up under sec. 78 of $18,236,696 attributable to the claimed dividend from ITC and $59,170 attributable to petitioner's Belgium subsidiary.

[13]The total tax before and after foreign tax credits also reflected an alternative minimum tax of $927,944 and an environmental tax of $62,417.

petitioner's 1993 Schedule C.

In the fall of 1996, respondent began an examination of petitioner's taxable years ended June 30, 1990, 1991, 1992, and 1993. On October 8, 1996, petitioner mailed to respondent a letter on petitioner's letterhead, entitled "STATEMENT FURNISHED UNDER REVENUE PROCEDURE 94-69", which respondent received on October 11, 1996 (October 11, 1996 disclosure letter). Price Waterhouse had drafted that letter. The October 11, 1996 disclosure letter stated in pertinent part:

> As previously disclosed to the Internal Revenue Service (IRS) in July 1995, and on September 24, 1996, InterTAN, Inc. [petitioner] is facing under Internal Revenue Code Section 905(c) a potential redetermination of the foreign tax credits claimed on its U.S. income tax returns for the years ended June 30, 1990 through June 30, 1993. <u>The redetermination could arise from a potential deficit in the post-1986 pool of foreign taxes for InterTAN Canada Ltd. (InterTAN Canada) [ITC]</u>. In this eventuality, InterTAN, Inc.'s foreign tax credits would be required to be redetermined pursuant to Treasury Regulation Section 1.905-3T(d)(4)(iv) with notification made by InterTAN Inc. pursuant to Treasury Regulation Section 1.905-4T(b).
>
> The dividends paid by InterTAN Canada from the 1988 through 1992 tax years are as follows:

| Tax Year | Type of Dividend | Amount | Deemed-paid Foreign Tax Credit | Grossed-up Dividend |
|---|---|---|---|---|
| 1988 | Preferred Stock Redemption | $23,910,500 | $15,720,834 | $39,631,334 |
| 1989 | Preferred Stock Redemption | 13,570,739 | 8,745,782 | 22,316,521 |
| 1992 | Preferred Stock Redemption | 20,000,000 | 18,236,696 | 38,236,696 |

InterTAN Canada incurred losses in the 1990 through 1992 tax years and carried them back to obtain refunds of Canadian income taxes.  The refunds obtained are as follows:

| Tax Year for Which Taxes Originally Paid | Amount of Refund in Canadian $ | Exchange Rate | Amount of Refund in U.S. $ |
|---|---|---|---|
| 6/30/88 | $  901,411 | .8141 | $   733,868 |
| 6/30/89 | 16,621,759 | .8320 | 13,829,147 |
| 6/30/90 | 9,782,191 | .8610 | 8,422,855 |

The reductions to InterTAN Canada's post-1986 pool of foreign taxes resulting from the distributions and the refunds could create a deficit in the pool.  Presently, however, it is unclear whether InterTAN Canada's post-1986 pool of taxes is, in fact, in a deficit position. The uncertainty arises from two factors.

First, in the examination of InterTAN Inc's 1986 through 1988 tax returns, the IRS has proposed to recharacterize the June 30, 1989 preferred stock re-demption.  The taxpayer reflected the transaction as a dividend distribution; but the IRS has argued the instrument was debt and the distribution, a repayment. Should the IRS position be sustained, there would have been no deemed distribution of foreign taxes to reduce the post-1986 pool.  The examination is currently in the jurisdiction of the appellate division of the IRS. In addition, Revenue Canada is currently examining InterTAN Canada's income tax returns and has proposed adjustments that could significantly increase the balance of InterTAN Canada's pool of foreign taxes. The characterization of the 1989 distribution as a repayment of debt or significant assessments by Revenue Canada could each independently affect InterTAN Can-ada's pool of foreign tax such that the pool would not have a deficit balance. [Emphasis added; footnotes omitted.]

On December 17, 2001, respondent accepted Form 870-AD, Offer to Waive Restrictions on Assessment and Collection of Tax Defi-ciency and to Accept Overassessment (Form 870-AD), which peti-

tioner had signed and submitted to respondent with respect to petitioner's taxable years ended June 30, 1989, 1990, 1991, 1992, 1993, and 1994. With respect to petitioner's taxable year ended June 30, 1993, Form 870-AD reflected petitioner's agreement to an overassessment of $712,316. That agreement was explained in Form 3610, Audit Statement, and Form 5278, Statement--Income Tax Change, which were prepared on November 27, 2001 (collectively, respondent's November 27, 2001 audit report). In respondent's November 27, 2001 audit report, respondent determined that: (1) Petitioner's income attributable to the claimed dividend from ITC should be decreased by $38,236,696, representing a decrease of dividends received of $20,000,000 and a decrease in foreign dividend gross-up under section 78 of $18,236,696; (2) the foreign tax credits that petitioner claimed as a result of the claimed dividend income from ITC were disallowed; and (3) petitioner had a loss of $8,906,122 attributable to a net operating loss carried back from petitioner's taxable year ended June 30, 1995.

On February 7, 2002, respondent issued a notice of deficiency (notice) to petitioner. In that notice, respondent determined that petitioner is liable for the year at issue for the accuracy-related penalty under section 6662(a). That is because respondent determined that there was an understatement of $5,004,095 in petitioner's 1993 return that was attributable to

the foreign tax credits which petitioner claimed with respect to the $20 million dividend that it reported it received from ITC and that that understatement is substantial within the meaning of section 6662(d)(1)(A) and (B).

## OPINION

Petitioner bears the burden of proving that the determination in the notice is erroneous.[14]  See Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).

Section 6662(a) imposes an accuracy-related penalty equal to 20 percent of the tax resulting from a substantial understatement of income tax.  An understatement is equal to the excess of the amount of tax required to be shown in the tax return over the amount of tax shown in such return, see sec. 6662(d)(2)(A), and is substantial in the case of a corporation if the amount of the understatement for the taxable year exceeds the greater of 10 percent of the tax required to be shown in the tax return for that year or $10,000, see sec. 6662(d)(1)(A) and (B).

The amount of the understatement may be reduced to the extent that it is attributable to, inter alia, the tax treatment of an item for which there is or was substantial authority.  See sec. 6662(d)(2)(B)(i).  The substantial authority standard is an objective standard involving an analysis of the law and the

_____

[14]Respondent's examination of the year at issue began before July 23, 1998.  We conclude that sec. 7491(c) is not applicable in the instant case.

application of the law to relevant facts. Sec. 1.6662-4(d)(2), Income Tax Regs. That standard is not so stringent that a taxpayer's treatment must be one that has a greater than 50-percent likelihood of being sustained in litigation. See id. However, the substantial authority standard is more stringent than the reasonable basis standard as defined in section 1.6662-3(b)(3), Income Tax Regs. Sec. 1.6662-4(d)(2), Income Tax Regs. There may be substantial authority for more than one position with respect to the same item. Sec. 1.6662-4(d)(3)(i), Income Tax Regs.

In order to satisfy the substantial authority standard of section 6662(d)(2)(B)(i), a taxpayer must show that the weight of the authorities supporting the tax return treatment of an item is substantial in relation to the weight of authorities supporting contrary treatment. Antonides v. Commissioner, 91 T.C. 686, 702 (1988), affd. 893 F.2d 656 (4th Cir. 1990); sec. 1.6662-4(d)(3)(i), Income Tax Regs. All authorities relevant to the tax treatment of an item, including the authorities contrary to the treatment, are taken into account in determining whether substantial authority exists. Sec. 1.6662-4(d)(3)(i), Income Tax Regs. The weight of authorities is determined in light of the pertinent facts and circumstances. Id. The weight accorded an authority depends on its relevance and persuasiveness and the type of document providing the authority. Sec. 1.6662-

4(d)(3)(ii), Income Tax Regs. An authority which is materially distinguishable on its facts or otherwise inapplicable to the tax treatment at issue is not particularly relevant and is not substantial authority. Id. There may be substantial authority for the tax treatment of an item despite the absence of certain types of authority. Id. Thus, a taxpayer may have substantial authority for a position even where it is supported only by a well-reasoned construction of the pertinent statutory provision as applied to the relevant facts. Id.

The amount of the understatement may also be reduced to the extent that it is attributable to, inter alia, an item for which the relevant facts affecting the item's tax treatment were adequately disclosed in the return or in a statement attached to the return. Sec. 6662(d)(2)(B)(ii). In order to satisfy the adequate disclosure standard of section 6662(d)(2)(B)(ii), a taxpayer must disclose the relevant facts on a properly completed form (i.e., Form 8275, Disclosure Statement (Form 8275)) attached to the return or to a qualified amended return. Sec. 1.6662-4(f)(1), Income Tax Regs. In Revenue Procedure 94-69, 1994-2 C.B. 804 (Revenue Procedure 94-69), the Internal Revenue Service (IRS) promulgated procedures under which certain taxpayers[15] may meet the requirements for adequate disclosure under

---

[15]The parties do not dispute that petitioner is the type of taxpayer to which the rules of Revenue Procedure 94-69 apply.

section 6662(d)(2)(B)(ii).  Under Revenue Procedure 94-69, a qualifying taxpayer may submit a statement to the IRS which will qualify as adequate disclosure under section 6662(d)(2)(B)(ii) and the regulations thereunder if, inter alia, the statement discloses "information that reasonably may be expected to apprise the Internal Revenue Service of the identity of the item, its amount, and the nature of the controversy or potential contro-versy."  Rev. Proc. 94-69, sec. 3.02(2), 1994-2 C.B. at 806.

If the disputed transaction is a tax shelter within the meaning of section 6662(d)(2)(C)(ii), a taxpayer may not avoid liability for the accuracy-related penalty by adequately disclos-ing the transaction in question.  Sec. 6662(d)(2)(C)(i)(I). Moreover, in the case of a tax shelter, in order to avoid liabil-ity for the accuracy-related penalty, a taxpayer not only must demonstrate that there is or was substantial authority for the tax return treatment of the transaction in question, but also must prove that it reasonably believed that that treatment is more likely than not the proper treatment.  Sec. 6662(d)(2)(C)(i)(II).

The accuracy-related penalty under section 6662(a) does not apply to any portion of an underpayment if it is shown that there was reasonable cause for, and that the taxpayer acted in good faith with respect to, such portion.  Sec. 6664(c)(1).  The determination of whether the taxpayer acted with reasonable cause

and in good faith depends on the pertinent facts and circumstances, including the taxpayer's efforts to assess such taxpayer's proper tax liability, the knowledge and experience of the taxpayer, and the reliance on the advice of a professional, such as an accountant. Sec. 1.6664-4(b)(1), Income Tax Regs. Reliance on the advice of a professional, such as an accountant, does not necessarily demonstrate reasonable cause and good faith unless, under all the circumstances, such reliance was reasonable and the taxpayer acted in good faith. Id. In this connection, a taxpayer must demonstrate that its reliance on the advice of a professional concerning substantive tax law was objectively reasonable. Chamberlain v. Commissioner, 66 F.3d 729, 732-733 (5th Cir. 1995), affg. in part and revg. in part T.C. Memo. 1994-228; Goldman v. Commissioner, 39 F.3d 402, 408 (2d Cir. 1994), affg. T.C. Memo. 1993-480. In the case of claimed reliance on the accountant who prepared the taxpayer's tax return, the taxpayer must establish that correct information was provided to the accountant and that the item incorrectly omitted, claimed, or reported in the return was the result of the accountant's error. Westbrook v. Commissioner, 68 F.3d 868, 881 (5th Cir. 1995), affg. T.C. Memo. 1993-634; Weis v. Commissioner, 94 T.C. 473, 487 (1990); Ma-Tran Corp. v. Commissioner, 70 T.C. 158, 173 (1978).

In the instant case, respondent determined that there was an understatement of $5,004,095 in petitioner's 1993 return that was

attributable to the foreign tax credits which petitioner claimed with respect to the $20 million dividend that it reported it received from ITC and that that understatement is substantial within the meaning of section 6662(d)(1)(A) and (B). In support of that determination, respondent advances two alternative positions. First, respondent argues: The disputed transaction is a tax shelter within the meaning of section 6662(d)(2)(C)(ii); petitioner's treatment of the disputed transaction in petitioner's 1993 return is not supported by substantial authority; petitioner did not reasonably believe that its treatment of the disputed transaction was more likely than not the proper treatment; and petitioner did not have reasonable cause for, or act in good faith with respect to, its treatment of the disputed transaction in petitioner's 1993 return. Alternatively, respondent argues that, even if the disputed transaction were not a tax shelter within the meaning of 6662(d)(2)(C)(ii), petitioner's treatment of the disputed transaction is not supported by substantial authority; the relevant facts affecting the tax treatment of the disputed transaction were not adequately disclosed in petitioner's 1993 return or in the October 11, 1996 disclosure letter; and petitioner did not have reasonable cause for, or act in good faith with respect to, its treatment of the disputed transaction in petitioner's 1993 return (respondent's alternative position).

With respect to respondent's position that the disputed transaction is a tax shelter within the meaning of section 6662(d)(2)(C)(ii), petitioner argues that the disputed transaction did not have any of the common indicia of a tax shelter (e.g., marketing by a promoter, dissemination of a confidential prospectus, and a special fee or premium paid to a promoter). According to petitioner, the disputed transaction was nothing more than normal dividend planning that was typical of multinational companies like petitioner.

We need not resolve the parties' dispute over whether the disputed transaction is a tax shelter within the meaning of section 6662(d)(2)(C)(ii). That is because, assuming arguendo that we were to accept petitioner's argument and find that the disputed transaction is not a tax shelter under that section, on the record before us, we accept respondent's alternative position that petitioner is nonetheless liable for the accuracy-related penalty under section 6662(a).

With respect to respondent's argument under respondent's alternative position that there is and was no substantial authority for petitioner's tax treatment of the disputed transaction, petitioner counters that its reporting of the disputed transaction in petitioner's 1993 return "was mandated by the provisions of Code §§ 301 and 302." On the record before us, we reject petitioner's position.

In structuring and implementing the disputed transaction, petitioner was not motivated by any nontax business purpose; petitioner's sole intention was to generate a tax benefit in the form of foreign tax credits. The disputed transaction resulted in no change in the economic position of either petitioner or ITC.[16] Petitioner did not have any benefits or burdens associated with the preferred stock that ITC purportedly issued to it. The purported issuance to petitioner of ITC's preferred stock was but one fleeting, transitory step in the disputed transaction that was undertaken so that ITC could purportedly immediately redeem that stock, thereby enabling petitioner to claim that such redemption resulted in a dividend to it under sections 302 and

---

[16]With respect to whether the disputed transaction resulted in any change in the economic position of petitioner or ITC, Mr. Saunders testified as follows:

Q    InterTAN Canada's [ITC's] financial position before this transaction began was exactly the same as it was after this transaction began.  Correct?

A    That's correct.

Q    InterTAN U.S.'s [petitioner's] financial position before this transaction began was exactly the same as its financial condition after this transaction began.

A    Except for the deemed foreign tax credits. Yes.

Q    Other than--of course, other than for tax benefits, it was the same.  Right?

A    Yes.

301.[17]  On the record before us, we find that the disputed transaction, including the purported issuance to petitioner of ITC's preferred stock and the purported redemption by ITC of that stock, should be disregarded for tax purposes.  On that record, we further find there was no ITC preferred stock owned by petitioner that could have been redeemed by ITC.  On the record before us, we conclude that sections 302 and 301 have no application to, and do not constitute substantial authority under section 6662(d)(2)(B)(i) and the regulations thereunder for petitioner's tax treatment of, the disputed transaction.

In addition to relying on sections 302 and 301 as substantial authority for its tax treatment of the disputed transaction, petitioner relies on Estate of Crellin v. Commissioner, 203 F.2d 812 (9th Cir. 1953), affg. 17 T.C. 781 (1951), and Soreng v. Commissioner, 158 F.2d 340 (7th Cir. 1946), affg. 4 T.C. 870 (1945).  Both of those cases involved the declaration of a dividend, and not the purported issuance and the purported immediate redemption of stock under section 302.  Estate of Crellin and Soreng are materially distinguishable from the instant case and do not constitute substantial authority for

_____

[17]Instead of having petitioner purportedly contribute money to ITC and having ITC declare a dividend payable to petitioner as two steps of the transaction in question, the steps of the disputed transaction consisting of the purported issuance of ITC's preferred stock and the purported immediate redemption of that stock were used in order to help avoid the Canadian nonresident withholding tax on dividends.

petitioner's tax treatment of the disputed transaction. Sec.
1.6662-4(d)(3)(ii), Income Tax Regs.

On the record before us, we find that petitioner has failed
to carry its burden of showing that there is or was substantial
authority within the meaning of section 6662(d)(2)(B)(i) and the
regulations thereunder for the position that it took in peti-
tioner's 1993 return with respect to the disputed transaction.[18]
We conclude that the amount of the understatement attributable to
the disputed transaction is not reduced under section
6662(d)(2)(B)(i).

With respect to respondent's argument under respondent's
alternative position that there was no adequate disclosure of the
relevant facts affecting the tax treatment of the disputed
transaction in petitioner's 1993 return or in the October 11,
1996 disclosure letter, respondent contends that:  (1) Petitioner

_____

[18]Petitioner also argues that, even if the purported issu-
ance and the purported immediate redemption of ITC's preferred
stock lacked economic substance or are otherwise disregarded for
tax purposes, there nonetheless is substantial authority for
treating the remaining steps of the disputed transaction as a
dividend from ITC to petitioner.  On the record before us, we
reject that argument.  The disputed transaction did not involve
the declaration of a dividend by ITC to petitioner.  If we were
to disregard the purported issuance and the purported immediate
redemption of ITC's preferred stock, the steps of the disputed
transaction that would remain are:  (1) A purported loan by Royal
Bank to ITC, (2) a purported repayment by ITC to petitioner of an
outstanding loan from petitioner to ITC, and (3) a purported loan
by petitioner to ITC in order to pay off the purported loan by
Royal Bank to ITC.  Petitioner cites no authority or facts that
would support the recharacterization of those remaining steps as
a dividend.

did not attach Form 8275 to petitioner's 1993 return as required by section 1.6662-4(f)(1) and (2), Income Tax Regs., and (2) the October 11, 1996 disclosure letter failed to provide information that reasonably could have been expected to apprise the IRS of the nature of the controversy or potential controversy that the disputed transaction raised.  Petitioner does not dispute respondent's position concerning petitioner's failure to attach Form 8275 to petitioner's 1993 return, but disputes respondent's position concerning the October 11, 1996 disclosure letter.

According to respondent, the October 11, 1996 disclosure letter failed to disclose that

> the purported dividend was "paid" solely to generate deemed foreign tax credits, the funds to "pay" the "dividend" were furnished by RBC [Royal Bank], the "dividend" was prearranged to be and was returned by petitioner to ITC the next business day, etc. * * *

Petitioner counters that the October 11, 1996 disclosure letter qualifies as a qualified amended return under Revenue Procedure 94-69 because it contained information that reasonably could have been expected to apprise the IRS of the nature of the controversy or potential controversy that the disputed transaction raised.  According to petitioner, the October 11, 1996 disclosure letter

> disclosed the preferred stock redemption, its treatment of the proceeds of the redemption, the amount of the proceeds, and the fact that Respondent was currently challenging Petitioner's characterization of a prior ITC preferred stock redemption.

Petitioner maintains that the information set forth in the October 11, 1996 disclosure letter was sufficient under Revenue Procedure 94-69 to constitute adequate disclosure of the disputed transaction under section 6662(d)(2)(B)(ii) and the regulations thereunder.

On the record before us, we agree with respondent that the October 11, 1996 disclosure letter did not reasonably apprise the IRS of the nature of the controversy or potential controversy that the disputed transaction raised, as required by Revenue Procedure 94-69. The only potential controversy revealed in that letter was a redetermination of the foreign tax credits claimed by petitioner because of a potential deficit in ITC's post-1986 pool of foreign taxes (ITC's pool of foreign taxes).[19] The October 11, 1996 disclosure letter, by failing to disclose all the steps of the disputed transaction, did not provide information that reasonably could have been expected to apprise the IRS that: (1) Petitioner and ITC engaged in the disputed transaction solely to generate foreign tax credits; (2) the terms of the guarantee and assignment agreement required that any money received by petitioner from ITC be held in trust for and paid

---

[19]The reason for a possible redetermination of ITC's pool of foreign taxes disclosed in the October 11, 1996 disclosure letter was the possibility that, for reasons undisclosed by the record, a prior claimed dividend from ITC to petitioner would be characterized as a repayment of a loan and a reassessment by Canada of ITC's Canadian taxes.

over to Royal Bank; (3) on June 30, 1993, ITC purportedly borrowed $20 million from Royal Bank; (4) on June 30, 1993, ITC purportedly used that $20 million to make a payment to petitioner on an outstanding loan from petitioner to ITC; (5) on June 30, 1993, petitioner purportedly used the $20 million that it received from ITC in order to make a purported purchase of ITC's preferred stock; (6) on July 2, 1993, the next bank business day after June 30, 1993, petitioner purportedly lent ITC the $20 million that it received from ITC on June 30, 1993, in the purported redemption of ITC's preferred stock;[20] and (7) on July 2, 1993, the next bank business day after June 30, 1993, ITC repaid the $20 million that it purportedly borrowed from Royal Bank on June 30, 1993.

On the record before us, we find that petitioner has failed to carry its burden of proving that it adequately disclosed within the meaning of section 6662(d)(2)(B)(ii), the regulations thereunder, and Revenue Procedure 94-69 the relevant facts affecting the tax treatment of the disputed transaction in petitioner's 1993 return or in the October 11, 1996 disclosure letter. Assuming arguendo that we had found that the disputed transaction was not a tax shelter within the meaning of section

---

[20]As noted above, the purported redemption of ITC's preferred stock was disclosed in the October 11, 1996 disclosure letter. However, none of the remaining steps of the disputed transaction was disclosed in that letter.

6662(d)(2)(C)(ii), we conclude that the amount of the understate-ment attributable to the disputed transaction would not be reduced under section 6662(d)(2)(B)(ii).

With respect to respondent's argument under respondent's alternative position that petitioner did not have reasonable cause for, or act in good faith with respect to, its treatment of the disputed transaction in petitioner's 1993 return, petitioner counters that petitioner relied generally on Price Waterhouse for tax compliance and tax planning, that the disputed transaction was based upon recommendations that Price Waterhouse made, and that Price Waterhouse prepared petitioner's 1993 return. According to petitioner, it was reasonable for it to rely upon Price Waterhouse's advice because Mr. Saunders knew that Price Water-house was a reputable accounting firm with expertise in tax matters.

Respondent contends that petitioner failed to provide Price Waterhouse all of the necessary information regarding the dis-puted transaction, including the following:

> the funds for the purported dividend were to be pro-vided by an overdraft of ITC's RBC [Royal Bank] account guaranteed by petitioner; * * * that preferred stock would be purportedly issued and redeemed on the same day * * *; and that petitioner had committed to RBC to return the purported dividend to ITC's RBC account the next business day. * * * In addition, [Mr.] Bond testi-fied that he did not know if PW [Price Waterhouse] was aware of petitioner's guarantee of ITC's debts to RBC * * *.

Respondent further contends that, even if petitioner had provided

Price Waterhouse all the necessary information regarding the disputed transaction, petitioner failed to follow the advice given by Price Waterhouse to petitioner because petitioner failed to (1) vary the amount involved in each step of the disputed transaction and (2) spread those steps "over some length of time."

With respect to respondent's contention that petitioner did not provide Price Waterhouse all the necessary information regarding the disputed transaction, on the instant record, we agree with respondent. At trial, Mr. Bond testified that he did not know whether anyone at Price Waterhouse was aware of the guarantee and assignment agreement at the time Price Waterhouse was advising petitioner concerning the disputed transaction. The disputed transaction, as initially proposed by Price Waterhouse and as modified by Mr. Saunders, required, as the initial step of that transaction, that ITC make a payment to petitioner on an outstanding loan from petitioner to ITC. Under the guarantee and assignment agreement, any payment by ITC to petitioner "shall be received in trust for the [Royal] Bank and paid over to the Bank". On the record before us, we find that petitioner has failed to establish that Price Waterhouse was aware of the foregoing guarantee and assignment agreement at the time Price Waterhouse was advising petitioner about the disputed transaction or at the time Price Waterhouse was preparing petitioner's 1993

return.

In addition to failing to establish that petitioner made Price Waterhouse aware of the provisions of the guarantee and assignment agreement that would apply if the disputed transaction were effected, on the record before us, we find that petitioner has failed to establish that it made Price Waterhouse aware at the time Price Waterhouse was advising petitioner about the disputed transaction or at the time Price Waterhouse was preparing petitioner's 1993 return that steps 4 and 5 (i.e., petitioner's relending $20 million to ITC and ITC's using that $20 million to repay the $20 million that it borrowed from Royal Bank on June 30, 1993) were to, and did, take place on the next Canadian bank business day (i.e., July 2, 1993)[21] after June 30, 1993, the date on which steps 1, 2, and 3 were effected (i.e., ITC's purportedly borrowing $20 million from Royal Bank to make a payment to petitioner on an outstanding loan from petitioner to ITC, the purported issuance of ITC's preferred stock to petitioner in exchange for that $20 million, and ITC's purported redemption of that preferred stock for that $20 million).

Not only did petitioner not provide Price Waterhouse all the necessary information regarding the disputed transaction, on the record before us, we find that petitioner failed to follow the advice that Price Waterhouse gave it based upon the information

---

[21]July 1, 1993, was a bank holiday in Canada.

that petitioner made available to Price Waterhouse at the time the disputed transaction was being planned. The June 15, 1993 memorandum from Mr. Bond to Mr. Wettlaufer, petitioner's and ITC's senior vice president for finance and administration, advised petitioner that "varying the dollar amounts involved in the various steps by a significant amount (say $1 million) will help reduce exposure" to the IRS's "reclassifying the transaction as something other than a dividend and disallowing * * * [ITC's] deemed paid foreign tax credits associated with the dividend."[22] Petitioner did not follow that advice; the dollar amount in each step of the disputed transaction was the same, i.e., $20 million. Mr. Saunders testified that he did not recall why petitioner failed to vary the amounts involved in the various steps of the disputed transaction, as Price Waterhouse advised it to do in the June 15, 1993 memorandum.

Mr. Bond's draft June 1993 file memorandum also advised petitioner that the dollar amount in each step of the disputed transaction should be varied. In addition, that memorandum advised petitioner that the steps of the disputed transaction

---

[22]It is significant that the June 15, 1993 memorandum from Mr. Bond to Mr. Wettlaufer did not even outline the steps of the disputed transaction as they occurred. Instead, that memorandum referred to: (1) ITC's making a payment to petitioner on an outstanding loan; (2) a cash contribution to ITC by petitioner; (3) the declaration of a dividend by ITC to petitioner; and (4) petitioner's making a new loan to ITC in the first quarter of the next fiscal year.

should be spread out "over some length of time".[23]  Mr. Bond's draft June 1993 file memorandum gave the foregoing advice to petitioner for the following reasons set forth in that memorandum:

> The economic situations of both ITI [petitioner] and Canada [ITC] are the same after transaction [sic] as they were before the transaction.  Canada has an obligation due to ITI both before and after the transaction.  In addition, the cash ends up back in Canada after ITI makes the new loan.  Therefore, the IRS may attempt to take a position stating that the entire transaction is simply a sham undertaken to generate deemed paid foreign tax credits for ITI.  To the extent the amounts in each step of the transaction are comparable and the length of time lapsing between each step is short, the IRS will be able to build a better case for this position.

Petitioner did not follow the advice in Mr. Bond's draft June 1993 file memorandum.  The dollar amount in each step of the disputed transaction was the same, i.e., $20 million.  Moreover, the first three steps of the disputed transaction (i.e., ITC's purportedly borrowing $20 million from Royal Bank to make a payment to petitioner on an outstanding loan from petitioner to ITC, the purported issuance of ITC's preferred stock to petitioner in exchange for that $20 million, and ITC's purported redemption of that preferred stock for that $20 million) occurred

---

[23]It is significant that Mr. Bond's draft June 1993 file memorandum did not even outline the steps of the disputed transaction as they occurred.  Instead, that memorandum referred to: (1) ITC's making a payment to petitioner on an outstanding loan; (2) a cash contribution to ITC by petitioner; (3) the declaration of a dividend by ITC to petitioner; and (4) petitioner's making a new loan to ITC.

virtually simultaneously on June 30, 1993, and the last two steps (i.e., petitioner's relending $20 million to ITC and ITC's using that $20 million to repay the $20 million that it borrowed from Royal Bank on June 30, 1993) occurred virtually simultaneously on July 2, 1993, the next Canadian bank business day.

If, as petitioner claims, it relied on Price Waterhouse's advice set forth in the June 15, 1993 memorandum and in Mr. Bond's draft June 1993 file memorandum, it seems to us that petitioner would have followed such advice or would have been able to explain why it ignored such advice, which it has not.

The June 28, 1993 file memorandum from Mr. Bond is the only written memorandum from Price Waterhouse personnel that sets forth the steps of the disputed transaction as they occurred. However, that memorandum did not provide any advice by Price Waterhouse about the tax consequences of those steps. Instead, the June 28, 1993 file memorandum merely set forth what petitioner intended to do, as follows:

> In order to avoid the Canadian withholding tax, the Company plans to structure the transaction as a return of capital for Canadian tax purposes while still being considered a dividend for U.S. tax purposes. The Company plans to take the following action:
>
> 1. Canada will borrow $20 million (U.S.) from the bank and repay a portion of its debt owed to ITI.
>
> 2. ITI will use the $20 million to purchase a new class of preferred stock issued by Canada.

3.  Canada will redeem the preferred stock for $20 million.  **It is imperative that this step be accomplished before the end of the fiscal year.**

4.  After the end of the fiscal year, ITI will make a new loan to Canada.

Doug Saunders believes this will permit the Company to avoid the Canadian withholding tax since the transfer of funds to the U.S. should not constitute a dividend for Canadian tax purposes.  Whereas, the U.S. tax laws rely more on substance, the Canadian tax laws rely heavily on form.

The only advice in the June 28, 1993 file memorandum is attributed to Mr. Saunders and concerns the Canadian withholding tax issue.

With respect to respondent's argument under respondent's alternative position that petitioner did not have reasonable cause for, or act in good faith with respect to, its treatment of the disputed transaction in petitioner's 1993 return, petitioner further counters that it relied on oral advice (Mr. Wolf's alleged oral advice) given by Mr. Wolf, the Price Waterhouse partner responsible for Price Waterhouse's review and recommendation, to Mr. Saunders.  In this connection, Mr. Saunders testified that Mr. Wolf orally advised him that the disputed transaction would be respected if challenged by respondent.  The only evidence of Mr. Wolf's alleged oral advice is Mr. Saunder's uncorroborated testimony, which was self-serving to petitioner.[24]

---

[24]At the time of the trial in this case, Mr. Saunders was
(continued...)

Petitioner did not call Mr. Wolf to testify about Mr. Wolf's alleged oral advice.  We presume that petitioner did not call Mr. Wolf as a witness because his testimony would have been unfavorable to petitioner's position in this case.  <u>Wichita Terminal Elevator Co. v. Commissioner</u>, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947).  We are unwilling to rely on Mr. Saunders' testimony regarding Mr. Wolf's alleged oral advice.

On the record before us, we find that petitioner has failed to establish that it provided all the necessary information concerning the disputed transaction to Price Waterhouse.  On that record, we further find that petitioner has failed to establish that it followed the advice of Price Waterhouse with respect to the disputed transaction.  On the record before us, we find that petitioner has failed to carry its burden of proving that there was reasonable cause for, and that it acted in good faith with respect to, the underpayment in this case.

Based upon our examination of the entire record before us, we find that petitioner has failed to carry its burden of establishing that petitioner is not liable for the accuracy-related penalty under section 6662(a).

We have considered all of the contentions and arguments of petitioner and respondent that are not discussed herein, and we

---

[24](...continued)
performing services for petitioner under a consulting arrangement.

find them to be without merit, irrelevant, and/or moot.

To reflect the foregoing,

<u>Decision will be entered for</u>

<u>respondent</u>.